# Exhibit 2

IN THE CRIMINAL COURT FOR DAVIDSON COUNTY,
TENNESSEE AT NASHVILLE
DIVISION II

| | | |
|---|---|---|
| OSCAR SMITH | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | No. 89-F-1773 |
| v. | ) | **Capital Case** |
| | ) | |
| STATE OF TENNESSEE | ) | |
| | ) | **EXECUTION DATE:** |
| Respondent | ) | **APRIL 21, 2022** |

## MOTION TO REOPEN POST-CONVICTION PROCEEDINGS AND/OR FOR REVIEW UNDER THE POST-CONVICTION DNA ANALYSIS ACT OF 2001

After 32 years of adamantly asserting his innocence, Oscar Smith finally has proof that someone else murdered his family. Indeed, he now has the perpetrator's fingerprints and DNA. Last year Mr. Smith presented proof in this Court showing that the unknown assailant's fingerprints were on the awl that was indisputably used in the murders for which he was sentenced to death. Ex. 1, Report of Kathleen Bright--Birnbaum; *see* Ex. 2, TT Vol. 18, pp. 2566, 2600 (describing the wounds created by the awl). Mr. Smith also presented new expert palm print analysis that eviscerated the state's sole "scientific" proof at his capital trial—Sergeant Johnny Hunter's testimony that there was "no doubt" that the palm print at the murder scene belonged to Smith. Despite his proof that "the most important piece of evidence presented to the jury," was, in the end, junk science, the courts closed their doors to Mr. Smith. Ex. 3, DA Letter; *see Smith v. State*, No.

M202101339CCAR3PD, 2022 WL 854438, at *1 (Tenn. Crim. App. Mar. 23, 2022).

Now, as a result of new technological advances in DNA analysis, Mr. Smith has discovered DNA left behind by the murderer in that unknown print on the awl. Ex. 4, SERI Report. He files the instant Motion seeking review and relief, either through the reopening of his petition for postconviction relief or through a new action under the Post-Conviction DNA Analysis Act of 2001. The courts must listen now—or in 17 days, Tennessee will execute an innocent man.

## I. Factual and Procedural Background

As this Court is aware, Mr. Smith attempted to present proof of his innocence in July 2021. He filed, on the day relief became available, a Petition pursuant to the newly-enacted Post-Conviction Fingerprint Analysis Act of 2021, Tenn. Code Ann. §§ 40-40-403 through 40-40-413. In support of that Petition, Mr. Smith presented the declaration of Kathleen Bright-Birnbaum, a pre-eminent fingerprint examiner who primarily testifies for law enforcement. Ms. Bright-Birnbaum revealed that the identification of Mr. Smith by then -Sgt. Hunter of the Metro Police Department was "not supported."

He also presented the Court with Ms. Bright-Birnbaum's earlier analysis, wherein she found that Hunter had made multiple other errors besides wrongly "identifying" Mr. Smith. *See* Ex. 1 Bright-Birnbaum Report. While any error in fingerprint identification is horrifying, it is hard to evaluate which of Hunter's errors was most egregious.

First, after mishandling the evidence in Mr. Smith's case, Hunter failed to identify his own fingerprint among those collected, intrinsically

demonstrating incompetence and lack of professionalism. *Id.* at 12 (identifying latent print #001-01A—which Hunter identified as having come from the awl and labeled as "N/V" (or no value)—"as having been made by the Left Ring finger of Officer Hunter beneath the lift tape"); *see* U.S. Dep't of Just., Off. of Just. Programs, *Crime Scene Investigation: A Guide for Law Enforcement* 26–28 (2000) (because "handling of physical evidence is one of the important factors of the investigation," officers "shall ensure the effective collection, preservation, packaging, and transport of evidence" and should prioritize collecting evidence in a manner that "prevent[s] loss, destruction, or contamination"); 1 Am. Jur. Trials 555, *Locating & Preserving Evidence* § 21 (2022 update) (when picking up objects at a crime scene, the investigating officer must use "proper methods of moving, marking, packaging, and transporting the article, with the least possible chance of destroying or contaminating the evidence it may disclose," as it is "inexcusable for any investigator to go to the scene of a crime and handle objects promiscuously, open or close drawers, or move papers before they have been photographed and examined for fingerprints"); *see id.* at § 107 ("In moving an article suspected of having friction-ridge prints, the investigator should realize that he cannot handle the item indiscriminately merely because he is wearing gloves or is using a handkerchief or other fabric. It is true that this will prevent him from leaving his own prints, but it may also destroy prints already on the object.…Whenever an investigator moves an article while wearing gloves or using a handkerchief, he should tell the lab expert that he has done so.").

Additionally, Hunter then identified Mr. Smith as the murderer

3

based upon a biased and scientifically unsupported palm print analysis procedure, and he testified to that finding to an absolute certainty. Ex. 5, Trial Testimony Excerpt at 2010. Identifying the wrong man is particularly horrifying in a capital case, and the harm done to Mr. Smith cannot be overstated.

Arguably, however, Hunter's most egregious error was in failing to realize that he had an identifiable print from the perpetrator on the murder weapon itself. The perpetrator left a fingerprint on the awl. *See, Ex. 2,* TT Medical Examiner Testimony pps. 65,120(describing wounds inflicted by awl; *see also,* Ex. 6, Supp. TT of Opening and Closing Statements at 6 (arguing "[a]nd he had taken three weapons with him, a .22 pistol, a buck knife, which he carried frequently, and what's called an awl, which is like an ice pick, which is a leatherworking tool").

Hunter collected the perpetrator's print from the awl, but marked it as "N/V,"—or, "no value"— indicating that it could not be used for identification. Ex. 7*,* Hunter Report (dismissing 30 prints, including that on the awl, as having "no identifiable value"). As part of federal litigation, Bright-Birnbaum re-analyzed the prints lifted by Hunter and determined that Hunter had made 14 errors.[1] Among the errors was Hunter's

---

[1] For procedural reasons relating to the scope of the remand from the Supreme Court of the United States, Mr. Smith's actual innocence was not before the federal courts in 2016. Instead, he was constrained to the development and presentation of claims of ineffective assistance of counsel and post-conviction counsel under *Martinez v. Ryan*, 556 U.S. 1 (2012).

4

determination that the print on the awl, Item 001-01B, had no value. *See id*; Ex. 1, Bright-Birnbaum Report at 1-2. In addition to determining that Mr. Smith did not leave that print on the awl, Bright-Birnbaum found that Item 001-01B *was* identifiable—that is, enough of the print from the awl was lifted and preserved to provide sufficient information such that a comparison could be made. *Id.* at 2. Despite his compelling claim, the courts closed their doors to Mr. Smith for procedural reasons. *Smith v. State*, No. M202101339CCAR3PD, 2022 WL 854438, at *1 (Tenn. Crim. App. Mar. 23, 2022).

With his entitlement to relief based on the fingerprint evidence on appeal,[2] Mr. Smith learned that new DNA technology is available. Though it has been theoretically possible to develop "touch DNA" for several years, the Applied Biosystems™ GlobalFiler™ PCR Amplification Kit was not developed until 2012 and did not become available in most labs until after 2017. Ex.4 at 8, SERI Rep. The fully continuous probabilistic genotyping software program used for analysis on the awl, Bullet Proof Sentry, was not available until 2022. *Id.* That is, touch DNA was not available until well after Mr. Smith's trial and post-conviction proceedings, and the technology used to perform the touch DNA analysis that supports this Motion was not available until

---

[2] Mr. Smith filed his Application for Permission to Appeal the denial of his Fingerprint Act petition to the Tennessee Supreme Court pursuant to Tennessee Rule of Appellate Procedure 11 on March 28, 2022. His Application remains pending as of the date of this filing.

5

this year. Ex. 4, SERI Report at 8.[3]

Upon realizing that Bright-Birnbaum's analysis showed that the unknown murderer's print was on the murder weapon and that new scientific procedures were available to obtain profiles in such circumstances, Mr. Smith sought touch DNA analysis of the awl. On January 19, 2022, this Court, seeing the agreement of the parties, ordered the release of the awl to Mr. Smith's DNA analyst. January 19, 2022 Agreed Order. On February 28, 2022, this Court ordered release of the known samples back to SERI. , 2d Agreed Order. Re-analysis of the known samples was required because the prior analysis results were not sufficient for comparison with the new technology used to analyze the biological material left behind on the awl.

On March 30, 2022, SERI issued a report confirming the presence of the unknown assailant's DNA on the murder weapon. Ex. 4, SERI Report at 4. That is, SERI found an identifiable DNA profile on the murder weapon and *definitively excluded* Oscar Smith as the contributor of that DNA. *Id.*

The significance of this result cannot be overstated: Oscar Smith has, using new touch DNA technology, demonstrated that he is not the

---

[3] As noted in the SERI report, the technology used here is so new that he had to re-examine the "known" specimens previously analyzed in 2016 so that a scientifically valid comparison could be achieved. Ex. 4, SERI Rep. at 2 (noting resubmission of items); *see also* Second DNA Order, February 28, 2022 (releasing the known samples to SERI pursuant to the parties' agreement).

person who used the awl to kill his family. Unlike other cases, there has never been any question that this crime was committed by one person. Indeed, in both opening and closing arguments, the prosecution argued that Mr. Smith, by himself, committed this crime. Ex. 6, Supp. TT of Open and Closing Statements at 4 ("Then he made the conscious decision, when he couldn't find someone else to do this dirty work for him, that he would kill."); *id.* at 4-8 (arguing that Mr. Smith committed the murders alone); *id.* at 62-64 (arguing that "there is only one man" who committed the crime). Mr. Smith did not kill his family. For 32 years, he has maintained his innocence and has attempted the nearly impossible task of proving a negative—that he did *not* murder anyone. Mr. Smith now presents this court with new scientific proof of his actual innocence: the fingerprint and the DNA of the perpetrator. He is entitled to relief.

## II. Motion to Reopen Petition for Post-Conviction Relief

Pursuant to Tennessee Code Annotated § 40-30-117, a petitioner may, in certain circumstances, have his post-conviction petition reopened by the trial court. One such circumstance is where the petitioner obtains "new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted[.]" Tenn. Code Ann. § 40-30-117(a)(2). The petitioner must allege facts which, if true, would "establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced." Tenn. Code Ann. § 40-30-117(a)(4); Tenn. Code Ann. § 40-30-117(b) (the factual basis must be supported by affidavit and "shall be limited to information which, if offered at an evidentiary hearing, would be admissible through the testimony of the affiant under

7

the rules of evidence").

Based upon the new scientific evidence contained in the SERI Report, this Court must permit Mr. Smith to reopen his post-conviction proceedings, and he should be granted an evidentiary hearing. At that evidentiary hearing, Mr. Smith should be permitted to present all evidence supporting his actual innocence to meet his burden of showing that his murder convictions should be set aside or, at a minimum, that his death sentence should be vacated.

### III. Post-Conviction DNA Analysis Act of 2001

The availability of STR technology and DNA testing databases have produced scores of DNA exonerations in recent years that have been nothing less than astonishing—both because of the minute traces of biological material involved and because of the grave errors revealed in a host of criminal cases where the defendants' guilt had appeared to be beyond dispute. The Tennessee legislature, through the Post-Conviction DNA Analysis Act of 2001, Tenn. Code Ann. § 40-30-301, *et seq.*, (the "DNA Act"), recognized the importance of granting access to DNA testing to individuals convicted of serious crimes and review of the integrity of those convictions in light of the results of such testing. The Act's legislative history shows it has two purposes: "to aid in the exoneration of those who are wrongfully convicted," and "to aid in identifying the true perpetrators of the crimes." *Powers v. State*, 343 S.W.3d 36, 44, 59 (Tenn. 2011). In recognition of those broad dual goals and the grave but real danger of wrongful conviction, the Tennessee Supreme Court has acknowledged that "[t]here is nothing in the Act limiting DNA testing to only those cases in which there was tenuous evidence supporting the

jury's finding of guilt." *Id.* at 57.

The DNA Act provides a procedural mechanism whereby convicted persons in Tennessee can seek exoneration through DNA testing. A petitioner, may, "at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence." Tenn. Code Ann. § 40-30-303. The Court may order DNA analysis if it finds:

> (1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-305. The testing must be performed by "a laboratory that meets the standards adopted pursuant to the DNA Identification Act of 1994 (42 U.S.C. § 14131 *et seq.*)." Tenn. Code Ann.

§ 40-30-310. "If the results of the post-conviction DNA analysis are favorable, the court shall order a hearing[.]" Tenn. Code Ann. § 40-30-312.

In this case, the parties agreed to DNA analysis, and the Court ordered release of the evidence for the purpose of the SERI examination. Feb. 22, 2022 Order. SERI meets the standards adopted pursuant to the DNA Identification Act of 1994, as required by Tennessee Code Annotated § 40-30-310. Ex. 8, SERI Accreditation Certificate. And there can be no serious doubt that the identification of a DNA profile on a murder weapon that *excludes* the condemned and the victims is "favorable" evidence. *See* Tenn. Code Ann. § 40-30-312. Thus, SERI's identification of the unknown assailant's DNA on the murder weapon entitles Mr. Smith to a hearing under the DNA Act.

As outlined above, the DNA Act does not contain a limitations period. Rather a petitioner may file a petition pursuant to the DNA Act "at any time," Tenn. Code Ann. § 40-30-303. A petitioner must nonetheless make his petition for "the purpose of demonstrating innocence and not to *unreasonably* delay the execution of sentence or administration of justice." Tenn. Code Ann. § 40-30-305(4) (emphasis added). While delay of Mr. Smith's execution could conceivably be required for this Court to be able to adjudicate Mr. Smith's entitlement to relief, Mr. Smith has been doggedly seeking this proof and has brought it to Court as soon as practicable after obtaining the results. This application is not driven by a desire to unreasonably delay the execution of Mr. Smith's sentence or the administration of justice. Rather, Mr. Smith seeks to demonstrate what he has maintained from the very

start—that he is not the perpetrator of this crime.

While there is no case law from Tennessee courts interpreting the DNA Act's unreasonable delay provision with respect to capital cases, at least one court in Texas, interpreting a similar provision of Texas law, granted a testing request submitted *the same day* a petitioner was set to be executed. In *Pruett v. State*, No. AP-77,065, 2017 WL 1245431, at *5 (Tex. Crim. App. Apr. 5, 2017), the court granted the last-minute request even though it "ha[d] no doubt the request for the proposed DNA testing was made to delay the execution of sentence" because "although such delay tactics appear to be unreasonable, it is not clear that they, in fact, are unreasonable. Although unlikely, it is not impossible to conceive that there could be exculpatory results[.]"

The same logic applies here. This is not a case where a last-minute claim has been brought based upon long-known facts or where a petitioner has slept on his rights. *See Ramirez v. Collier*, --- S. Ct. ----, 2022 WL 867311, at *13 (U.S. Mar. 24, 2022) (citing *Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992) (*per curiam*); *Gildersleeve v. New Mexico Mining Co.*, 161 U.S. 573, 578 (1896)). Rather, Mr. Smith has steadfastly maintained his innocence and has been attempting to prove his innocence in Tennessee state court for the better part of a year. This is instead a case where the development of new law and new scientific testing and methodology have allowed Mr. Smith—who has been incarcerated for more than three decades—to obtain new and previously unavailable facts that prove his innocence. *Herrera v. Collins*, 506 U.S. 390 (1993) ("[I]n a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a

defendant unconstitutional[.]"); *see, e.g., House v. Bell*, 547 U.S. 518 (2006) (new DNA evidence excluding capital petitioner as source of semen found in murder victim was "of central importance" where identity was an issue and where the previous DNA evidence pointing to petitioner was the sole forensic evidence presented to the jury); *Aguirre-Jarquin v. State*, 202 So.3d 785 (Fla. 2016) (ordering new trial and vacating death sentence for capital petitioner where new DNA evidence showed profile of alternate perpetrator, supporting petitioner's trial theory and persistent protestations of innocence). There is nothing unreasonable about seeking to use new information to save one's own life by proving one's innocence, no matter when that request is made. The Court should order a hearing.

## IV. Prayer for Relief

Mr. Smith respectfully requests the following:

1. This Court should grant the Motion to Reopen and set this case for further proceedings.

2. Having shown that the results of the post-conviction DNA analysis are favorable to Mr. Smith, this Court should order a hearing pursuant to Section 40-30-312.

4. Mr. Smith requests any and all process or relief as this Court deems necessary and appropriate in the interests of justice and to effectuate the purpose of Tennessee Code Annotated § 40-30-117 and/or the DNA Act.

12

Case 3:22-cv-00280 Document 1-2 Filed 04/18/22 Page 13 of 14 PageID #: 34

Respectfully submitted,

AMY D. HARWELL, BPR #18691
Asst. Chief, Capital Habeas Unit

KATHERINE M. DIX, BPR #22778
Asst. Federal Public Defender

FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE
810 Broadway, Suite 200
Nashville, TN 37203
Phone: (615) 736-5047
Fax: (615) 736-5265

BY: _____

Counsel for Oscar Smith

## CERTIFICATE OF SERVICE

I, Amy D. Harwell, certify that on April 4, 2022, a true and correct copy of the foregoing was sent to the Office of the District Attorney General, 226 2nd Avenue North, Suite 500, Washington Square, Nashville, Tennessee, 37201-1649.

BY: _____

Counsel for Oscar Smith