# Exhibit 4

IN THE CRIMINAL COURT FOR DAVIDSON COUNTY,
TENNESSEE AT NASHVILLE
DIVISION II

| | | |
|---|---|---|
| OSCAR SMITH | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | No. 89-F-1773 |
| v. | ) | **Capital Case** |
| | ) | |
| STATE OF TENNESSEE | ) | |
| | ) | **EXECUTION DATE:** |
| Respondent | ) | **APRIL 21, 2022** |

**MOTION TO RECONSIDER DENIAL OF
MOTION TO REOPEN POST-CONVICTION PROCEEDINGS
AND/OR FOR REVIEW UNDER THE
POST-CONVICTION DNA ANALYSIS ACT OF 2001**

Oscar Smith, by and through counsel, hereby moves this Court to reconsider its April 11, 2022 Order denying his Motion to Reopen Post-Conviction Proceedings and/or for Review Under the Post-Conviction DNA Analysis Act of 2001. In support of this motion, Mr. Smith submits:

**I.     Under the DNA Act, Mr. Smith's new DNA evidence is "favorable" and requires a hearing under the mandatory provision of Tennessee Code Annotated § 40-30-312, and the Court erred in focusing on the Section 305 inquiry.**

The hearing provision simply predicates a hearing "upon favorable results." Tenn. Code Ann. § 40-30-412. The Court implicitly found the presence of a DNA profile that definitively excludes the victim and the convicted on a murder weapon would seem to be amongst the *most* favorable evidence a criminal defendant could obtain. Instead, the Court

found that it must dismiss Mr. Smith's request under the DNA Act because he does not satisfy the standard for court-ordered DNA *analysis* under Section 305. Order at 11.

The DNA Act is clear and unambiguous: "If the results of the *post-conviction DNA analysis are favorable*, the court *shall* order a hearing[.]" Tenn. Code Ann. § 40-30-312 (emphasis added). The hearing provision does not provide that a hearing is required only where "the results of *court-ordered* DNA analysis are favorable." *See id.*; *State v. Nelson*, 23 S.W.3d 270, 271 (Tenn. 2000) (holding that courts should not incorporate "magic words" into statutes). And it certainly does not state that the reviewing court must find that a movant satisfies the Section 305 standard before obtaining a hearing under Section 312.

Here, the parties agreed that "post-conviction DNA analysis" should be performed and this Court entered orders permitting such analysis to proceed at a qualified laboratory. January 19, 2022, Agreed Order; February 28, 2022, 2d Agreed Order. All technical prerequisites to obtaining review and relief pursuant to the DNA Act have been satisfied. And yet, this Court myopically construed the hearing provision in a manner that prevents substantive review of new scientific evidence that the Court had "no reason to doubt" supports Mr. Smith's arguments. *See* Order at 10.

Such a reading of the DNA Act is textually unsupported and nonsensical as a matter of economy and efficiency. What ends are served by requiring this Court or any other to engage in the Section 304/305 analysis of whether additional testing is warranted when additional testing has already been performed, especially when that testing has

been agreed upon by the opposing party and signed off on by the court? The DNA Act cannot be construed in this manner without occurrence of absurd (and wasteful) results. *See, e.g.*, *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016) ("In construing statutes, Tennessee law provides that courts are to avoid a construction that leads to absurd results."). This Court's reading of the DNA Act frustrates one of its primary purposes: to aid in the exoneration of those who are wrongfully convicted. A hearing under Section 312 is warranted based on the facts and circumstances of this case.

## II. Under the DNA Act, the Court's Section 305 analysis failed to view the evidence in the light most favorable to Mr. Smith.

Despite the fact that the DNA analysis has already been completed, this Court focused its denial on one prong of the Section 305 standard— whether a "reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." Tenn. Code Ann. § 40-30-305. Even if this analysis is a precondition to an evidentiary hearing (which Mr. Smith disputes), this Court must nonetheless apply the correct legal standards to this analysis and make appropriate factual findings. This Court's dismissal order has failed in both respects.

This Court correctly quoted the leading decision, *Powers v. State*, 343 S.W.3d 46 (Tenn. 2011), for following propositions: that "the post-conviction court must consider all the available evidence," that the court must assume that "DNA testing will reveal exculpatory evidence"

3

and that the "evidence must be viewed in light of the effect that exculpatory DNA evidence would have had on the fact-finder or the State." Order at 8–9. However, the Court failed to apply this portion of *Powers*.

In *Powers*, the Tennessee Supreme Court was deeply concerned with the purpose of the DNA Act. It set out a detailed legislative history, emphasizing that the Act was "'created because of the possibility that a person has been wrongfully convicted or sentenced," and as such, the "mere fact" that other evidence of guilt was present "should not provide a basis for denying testing," even where that evidence was testimony from the victim identifying the petitioner as the perpetrator. *Id*. at 55 (quoting *Brown v. State*, No. M2002-02427-CCA-R3-PC, 2003 WL 21362197, at *2 (Tenn. Crim. App. June 13, 2003) (Tipton, J., concurring)). It thus found that the correct 305 analysis "*must focus on the strength of the DNA evidence* as compared to the evidence presented at trial." *Id*. (emphasis added). And in doing so, *Powers* instructed that courts must do a specific comparative analysis of "the way in which 'the particular evidence of innocence interacts with the evidence of guilt.'" *Id*. (quoting Brandon L. Garrett, *Claiming Innocence*, 92 Minn. L. Rev. 1629, 1646 (2008)); *see Haddox v. State*, No. M200300514CCAR3PC, 2004 WL 2544668 (Tenn. Crim. App. Nov. 10, 2004) ("The proper analysis for the trial court under the DNA Analysis Act necessarily includes a consideration of the effect on the jury of evidence showing that the Petitioner's DNA was not present on the baseball cap that was worn by the perpetrator and recovered at the crime scene.")).

*Powers* explicitly emphasized that "[t]here is nothing in the Act limiting DNA testing to only those cases in which there was tenuous evidence supporting the jury's finding of guilt." *Id*. at 57. Because the Supreme Court found this analysis should be fact specific and should focus on the *strength of the DNA analysis*, and *not* solely on the strength of the State's evidence of guilt at trial, it found that the recitation of the facts contained in prior appellate opinions should play a minor role in the court's assessment of the "reasonable probability" prong of the DNA Act. *Id*. at 56 (noting that facts from previous appeals "should not . . . be used to determine the merits of any claim, that is, whether the reasonable probability threshold has been established"). The Supreme Court went to great lengths to deemphasize the weight that should be given to prior factual determinations in the 305 assessment:

> [M]any DNA exonerations have occurred despite the fact that there was substantial evidence supporting the conviction. *See* Cynthia E. Jones, *The Right Remedy for the Wrongly Convicted: Judicial Sanctions for Destruction of DNA Evidence,* 77 Fordham L. Rev. 2893, 2926 (2009) ("[A]s is demonstrated with over 200 exonerations, DNA evidence, standing alone, has the persuasive force to prove that an innocent person has been wrongly convicted, notwithstanding all other evidence used at trial to prove guilt beyond a reasonable doubt."); Rodney Uphoff, *Convicting the Innocent: Aberration or Systemic Problem?,* 2006 Wis. L. Rev. 739, 778 (2006) (discussing the Arizona case of Larry Youngblood, who,

"[c]ontrary to the 'overwhelming evidence,' ... was, in fact, innocent" and had his conviction vacated in 2000). . . . The "reasonable probability" inquiry . . . requires courts to look at the effect the exculpatory DNA evidence would have had on the evidence at the time of trial . . . not on the evidence as construed by an appellate court in the light most favorable to the State.

*Id*. at 56–57.

In applying these standards to the facts of *Powers*, the Supreme Court found that the post-conviction court engaged in inappropriate "conjecture" on behalf of the State. *Id*. at 56 n.29 (noting that the post-conviction court erred in assuming facts not in evidence—specifically, the State's speculation regarding numerous sexual partners, a theory that it had not previously advanced, in order to dismiss the favorable impact of exclusionary DNA testing). It specifically found that the post-conviction court's "conjecture in favor of the State conflicts with our interpretation of the Act, which assumes results and inferences that are favorable to the petitioner." *Id*. at 56 n.29. Ultimately, *Powers* tasked post-conviction courts with "independently asses[ing] the probative value of the DNA and the effect it would have on the State's case" before making a 305 determination. *Id*. at 57 n.30.

**A. Contrary to *Powers*, the Court failed to consider both the ways the exculpatory DNA evidence interacts with previously presented favorable fingerprint evidence and the ways exculpatory DNA evidence is different than previously presented fingerprint evidence.**

As *Powers* instructs, courts must consider the way the "particular evidence of innocence interacts with the evidence of guilt." *Powers*, 343 S.W.3d at 55. Here, the Court quoted a portion of the CCA's recent fingerprint opinion in Mr. Smith's case, holding that, if the court stacked the most favorable fingerprint evidence against the trial evidence, the fingerprint evidence would not tip the scales in Mr. Smith's favor. Order at 11. This Court's dismissal order simply substituted the words "touch DNA" where the CCA's opinion had the word "fingerprint." *Id.* (quoting CCA Fingerprint Op., 2022 WL 854438, at *17). But the CCA was not presented with the legal question that is now before this Court.

Mr. Smith has now presented favorable DNA evidence *in addition to* the favorable fingerprint evidence he recently presented. Thus, these *two* pieces of evidence interact differently with the evidence of guilt than did the fingerprint analysis alone. Further, the Court's substitution of the words "touch DNA" for "fingerprint" in the CCA's fingerprint opinion also demonstrates that the Court did not engage with the differences in the previously presented favorable fingerprint evidence and the newly presented exonerating DNA evidence. Mr. Smith has presented the Court with evidence that that a murder weapon used in the crime has DNA that conclusively *does not* belong to him. This evidence is qualitatively

7

different than the fingerprint evidence. *See House v. Bell*, 547 U.S. 518, 540–41 (2006) (finding that "[p]articularly in a case like this where the proof was . . . circumstantial," the jury would have given "great weight" to DNA evidence excluding petitioner as the source of DNA found on the victim); *United States v. Herrera*, 704 F.3d 480, 486 (7th Cir. 2013) (noting that other forms of "matching" evidence, including fingerprint evidence and eyewitness identification are "less rigorous than the kind of scientific matching involved in DNA evidence").

This new evidence strongly suggests that someone besides Mr. Smith wielded the murder weapon. Under *Powers*, the Court must engage with *both* the DNA evidence *and* the fingerprint evidence (both the debunked palm print analysis *and* the evidence of an unidentified fingerprint that does not belong to Mr. Smith on the same awl). It must consider the weight of the evidence that an unknown perpetrator's DNA is on the awl, not simply repeat the CCA's words from an earlier opinion that did not present these factors. Otherwise, this Court has abandoned its obligation under *Powers* to independently assess the weight of the evidence of innocence.

**B. The Court failed to assume that the SERI report was favorable, erroneously relying on the DNA on Mrs. Smith's shirt as a basis for denying the motion.**

In its denial, the Court cited the SERI report for finding that Mr. Smith's DNA was on the "left sleeve of an 'off-white long sleeve shirt with large red/brown stains'" as a basis for its denial. Order at 11. The Court noted the shirt-sleeve evidence and then concluded, "Thus, the Court concludes there is not a reasonable probability that the recently

discovered DNA evidence would have prevented Mr. Smith's prosecution or conviction." *Id*. The Court's reliance on Mr. Smith's DNA on Mrs. Smith's shirt as proof of Mr. Smith's guilt (and resulting non-entitlement to a hearing) is based on an erroneous understanding of the record and demonstrates that this Court failed to properly apply the *Powers* standards.

The uncontested proof presented by the prosecution at trial conclusively established that Mr. Smith spent the day prior to the murders with Mrs. Smith. They drank coffee together at Waffle House before driving to the Gold Rush on Elliston, where they continued to be together for several hours. *See* TT. p. 2061–67 (testimony of Bruce Hornal that the Smiths were sitting together on the same side of the booth); *id.*, p. 2636 (testimony of Mary Jane Fitzpatrick that Smiths were sitting "side by side" for "a couple hours" while eating supper at the Gold Rush); *see also* Attach. A, Supp. Police Report by Det. McElroy (documenting Waffle House employee statement that Judy was wearing a "white long-sleeve shirt and blue jeans"). Because the proof presented at trial provides a completely innocent explanation for Mr. Smith's DNA on the victim's shirt, the Court's reliance on that portion of the SERI report as "proof" that there is not a reasonable probability that the newly produced DNA evidence would have made a difference was in error.

The Court further observed that "it is unclear whether the awl was preserved in such a manner that would have assured the DNA profiles were left at the crime scene and did not result from contamination." Order at 11 n.6. Though the Court stated that it would have granted Mr. Smith a hearing despite the Court's concerns about contamination, the

Court's speculation that contamination may have been the source of the unknown DNA reflects that the Court failed to analyze Mr. Smith's entitlement to relief under sections 304 and 305 under the *Powers'* presumption. *Powers*, 343 S.W.3d at 46.

*Powers* requires that this Court presume that the results of testing will be favorable—and then determine whether, with the favorable testing, there is any probability of a different result. *Id*. Here, the Court's footnote indicates that the Court failed to presume favorability. Instead, the Court speculated that the favorable results obtained by SERI could be the results of misconduct or mishandling of evidence. Such supposition is not part of the *Powers'* analysis. Indeed, it is contrary to *Powers'* instruction that post-conviction courts not "engag[e] in conjecture[.]" *Id*. at 56 n.29. The appropriate forum to engage with such open questions is an evidentiary hearing; until then, all inferences *must* be drawn in favor of Mr. Smith. Had the Court correctly applied these standards, it would have had no choice but to grant Mr. Smith an evidentiary hearing.

**C. The Court failed to consider the effect of residual doubt on the jury in finding no reasonable probability of more favorable verdict or sentence under Section 305.**

In Tennessee, "residual doubt evidence" may consist of proof admitted during the sentencing phase that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase. *State v. McKinney*, 74 S.W.3d 291, 307 (Tenn. 2002) It may include arguments regarding the proof during the guilt phase, new evidence presented at the penalty phase, or even impeachment testimony

of a "witness who offered direct rather than circumstantial proof of the defendant's involvement in the crime[.]" *State v. McKinney*, 74 S.W.3d 291, 307 (Tenn. 2002) (citing *State v. Hartman*, 42 S.W.3d 44, 55–56 (Tenn. 2001)). It may include arguments regarding the proof during the guilt phase, new evidence presented at the penalty phase, or even impeachment testimony of a "witness who offered direct rather than circumstantial proof of the defendant's involvement in the crime[.]" *See, e.g.*, *State v. Bane*, 57 S.W.3d 411, 422 (Tenn. 2001) (quoting *Hartman*, 42 S.W.3d at 57). "[I]n general residual doubt is one of the most compelling mitigating circumstances a capital defendant can establish to improve his chances of receiving a life sentence." *Hartman*, 42 S.W.3d at 59.

Here, the Court failed to consider residual doubt in its Section 305 analysis. Instead, the Court merely recited: "Nor is there a probability that the recently discovered DNA evidence would have resulted in a more favorable conviction or sentence for Mr. Smith had the DNA evidence been presented at trial." Order at 11. In this case, where capital sentencing and residual doubt are at issue, the examination must be whether the favorable evidence would have resulted in at least one juror *either* having reasonable doubt as to guilt *or* in weighing the evidence at sentencing in favor of life. The Court did not analyze how this new DNA evidence would have affected the jury—and erred in failing to consider the residual doubt such proof would have engendered.

Further, Mr. Smith now submits proof that the jury would not have imposed death had the DNA evidence been presented. As the declaration of Juror D shows, Juror D, at least, would not have voted for death had

Juror D known there was unknown DNA on the murder weapon. Attach. B, Decl. of Juror D. The Court cannot sincerely doubt that Mr. Smith has shown a reasonable probability that, had this exclusionary DNA evidence been available at the time of trial, he would have obtained a "more favorable verdict or sentence," thus satisfying Section 305.

## III. The Court applied the wrong standard in denying Mr. Smith's Motion to Reopen.

The Court denied Mr. Smith's motion to reopen post-conviction proceedings because, "given the extensive evidence of Mr. Smith's guilt produced at his trial, even when considering the DNA evidence resulting from SERI's recent testing in a light most favorable to the Petitioner, the Court concludes Mr. Smith would be unable to prove by clear and convincing evidence that the DNA evidence establishes he is actually innocent of the offenses for which he was convicted." Order at 12. This finding misapprehends Mr. Smith's burden of proof under Section 40-30-117.

Under Tennessee Code Annotated § 40-30-117, in cases involving a fundamental right that could not have been litigated previously, a motion to reopen must be granted when a petitioner presents a "colorable claim." *Howell v. State*, 151 S.W.3d 450, 462–63 (Tenn. 2004). In *Howell*, the Tennessee Supreme Court addressed the statutory standard required to reopen post-conviction in the context of an *Atkins* case. The Court decided that requiring a capital defendant to produce clear and convincing evidence of his intellectual disability in order to reopen post-conviction would violate the constitution. The Court held "in light of the fact the petitioner could not have litigated his claim at any earlier proceeding"

12

the clear and convincing standard will apply after a hearing, but that a hearing must be granted upon a showing of a "colorable claim." *Id.*

Equally, in *Van Tran v. State*, 66 S.W.3d 790, 823–24 (Tenn. 2001), the Supreme Court followed *Howell* and held that that fundamental fairness requires that "the petitioner have a meaningful opportunity to raise his substantive constitutional claim." Mr. Smith has never had an opportunity to raise his constitutional claim that his sentencing was anything but reliable, because the jury never heard that DNA evidence shows that someone else committed the crime. Capital sentencing requires a jury to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *State v. Jones*, 568 S.W.3d 101, 136 (Tenn. 2019) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (cleaned up)); *see also Penry v. Johnson*, 532 U.S. 782, 797 (2001); *Skipper v. South Carolina*, 476 U.S. 1, 4–5, 8, (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).

Here, where the Court determined that Mr. Smith could not have produced this evidence sooner, the Court must apply the standard set out in *Howell* and *Van Tran*. Applying that standard, the Court must, now, conclude that Mr. Smith has presented a colorable claim worthy of meaningful, substantive review.

## IV. Prayer for Relief

Mr. Smith respectfully requests the following:

1.     This Court should grant the Motion to Reopen and set this case for further proceedings.

2.    Having shown that the results of the post-conviction DNA analysis are favorable to Mr. Smith, this Court should order a hearing pursuant to Section 40-30-312.

4.    Mr. Smith requests any and all process or relief as this Court deems necessary and appropriate in the interests of justice and to effectuate the purpose of Tennessee Code Annotated § 40-30-117 and/or the DNA Act.

5. Should the Court require additional time so to thoroughly review the record of the case, including the transcript so to properly evaluate the effect of this new DNA evidence on the actual evidence from trial as required by *Powers*, the Court should indicate that so that Mr. Smith may include the Court's request in his Motion to Vacate Execution Date.

Respectfully submitted,

AMY D. HARWELL, BPR #18691
Asst. Chief, Capital Habeas Unit

KATHERINE M. DIX, BPR #22778
Asst. Federal Public Defender

FEDERAL PUBLIC DEFENDER FOR
THE      MIDDLE      DISTRICT      OF
TENNESSEE
810 Broadway, Suite 200
Nashville, TN  37203
Phone: (615) 736-5047
Fax: (615) 736-5265

BY:

_____
Counsel for Oscar Smith

## CERTIFICATE OF SERVICE

I, Amy D. Harwell, certify that on April 11, 2022, a true and correct copy of the foregoing was sent to the Office of the District Attorney General, 226 2nd Avenue North, Suite 500, Washington Square, Nashville, Tennessee, 37201-1649 by email and the Court's electronic filing system.

BY:

_____
Counsel for Oscar Smith

# ATTACHMENT A

METROPOLITIAN POLICE DEPARTMENT
NASHVILLE, TN.

SUPPLEMENT REPORT
PAGE NUMBER 2
10/05/89

SMITH, JUDITH L.
BARNETT, CHAD A.
BARNETT, JASON D

89-254932/7
89-255325
89-255324

1830 HRS.; MET WITH DR. G. HARLAN, SGT. JOHNNY HUNTER AND OFFICER RALPH DEAVERS, AT THE CIRME SCENE AND ASSITED AS DR. HARLAN REVIEWED THE SCENE TO ASSIT HER IN PREPARING HER REPORT.

1916 HRS.; I THEN LEFT THE SCENE IN MY POLICE UNIT AND RAN A TIME AND MILEAGE CHECK FROM THE SCENE TO THE HOME OF THE SUBJECT OSCAR FRANK SMITH, I FOUND THAT BY DRIVING AS FAST AS SAFELY POSSIBLE AND NEVER EXCEEDING 80 MPH IS WAS ABLE TO TRAVEL THE 30.9 MILES TO THE SUBJECT'S HOME IN 26 MINUTES BY MY WATCH, I THEN RETURNED TO THE CRIME SCENE VIA THE SAME ROUTE, NOLENSVILLE RD TO I 440 TO I-24 EAST TO EXIT 29 TO THE GRAVEL ROAD TO THE SUBJECT'S HOUSE AND DRIVING IN THE NORMAL FLOW OF TRAFFIC NEVER EXCEEDING 65 MPH I WAS ABLE TO MAKE THE RETURN TRIP IN 36 MINUTES BY MY WATCH.

2030 HRS.; WAS CALLED BY DR. G. HARLAN AND MET HER AT THE FORENSIC SCIENCE CENTER AND WE DISCUSSED THE CASE. IT WAS THEN DETERMINED THAT THE NAMES OF JASON AND CHAD HAD BEEN REPORTED INCORRECTLY TO POLICE ON SERVERAL DIFFERENT OCCASIONS AND THAT THE LAST NAME IS BURNETT NOT BARNETT (SUPPLEMENT WILL BE SENT TO RECORDS TO CHANGE FACE SHEET) SHE STATED THAT BASED ON HER EXAMINATION THAT CHAD HAD SUFFERED A STAB WOUND TO THE ABODMENT THAT PENTRATED 5.8 INCHES AND THAT JASON HAD A LACERATION IN THE ABODMENT THAT WAS 4.5 INCHES LONG AND PENTRATED 3.8 INCHES. SHE STATED THAT POSSIBLY THAT THE LACERATIONS TO THE NECK OF EACH VICTIM WAS POST MORTEM AND SUPERFICIAL, BUT THIS DETERMINATION WOULD BE MADE AFTER ADDITIONAL STUDY.

2100 HRS.; RETURNED TO CID AND CONTACTED DEBORAH ALLEN, EMPLOYEE OF THE WAFFLE HOUSE AND SHE STATED THAT SHE SAW THE VICTIM AND SUBJECT ON OCTOBER 1, 1989 AT THE WAFFLE HOUSE AND THAT THE SUBJECT WAS WEARING A BLUE PLAID SHORT SLEEVE SHIRT AND BLUE JEANS, JUDY WAS WEARING A WHITE LONG SLEEVE SHIRT AND BLUE JEANS, SHE COULD ADD NO ADDITIONAL INFORMATION.

2130 HRS.; I THEN BEGAN TO PREPARE AND COMPLETE A SEARCH WARRANT FOR THE DIRT MOUND ON THE PROPERTY OF OSCAR AND FLORENCE SMITH IN ROBERTSON COUNTY AND LISTED DET. BILLY PRIDEMORE AS THE AFFIANT AND LIST THE PROBABLE CAUSE.

INVESTIGATION TO CONTINUE

DET. TERRY MCELROY, 17058
MURDER SQUAD/CID

OSDA -020300-292

02852

# ATTACHMENT B

JUROR D

Declaration of

JUROR D

I, _____ being of lawful age
and legal resident of Nashville, David-
son County, Tennessee declare the
following to the best of my information and
belief:

1) I was a juror in the homicide trial of
Oscar Smith.

2) On April 2, 2022, Mr. Smith's counsel
visited me at my home. Counsel told
me that an unknown person's DNA was
found on the awl, the murder weapon.

3) If I had known of the unknown
DNA at trial, I would have not
voted for death.

I declare under penalty of perjury
under the laws of the United States
and the State of Tennessee, that the
foregoing is true and correct.

JUROR D

4/2/ 2022