# ATTACHMENT A

1  Q               Okay. Did they have any children by
2  that marriage?
3  A               They had twin boys.
4  Q               What are their names?
5  A               Christopher and Casey.
6  Q               Okay. How old are they?
7  A               They just turned three, and that was in
8  December, I guess. They're three and a half.
9  Q               What name did everyone in your family
10 call Mr. Smith by?
11 A               Frank.
12 Q               Okay. Did you ever know him by any
13 other first name than Frank?
14 A               No.
15 Q               Is that what Judy Smith and Chad
16 and Jason Burnett called him?
17 A               Yes, sir.
18 Q               Did you personally ever hear Mr. Smith
19 make any threats against your daughter or Chad and
20 Jason Burnett?
21 A               On -- just a couple of weeks before, it
22 was two or three weeks, I can't recall the exact time
23 frame there, about two or three weeks before that, he
24 came to the house. He was supposed to pick up the
25 twins and Judy was not there. And he said, "You tell

                                                    1808

Judy that I've been playing with her with kid gloves, but now the gloves are coming off.

One other occasion at their house, he had said if she ever left him that she -- that he would kill her.

Q        Prior to her death, during the period that she was separated from Mr. Smith, did she ever express fear for herself and her children from anybody?

A        Yes, she did.

Q        Who was that, please, sir?

A        From Frank.

Q        After your daughter moved to Lutie Street, who provided all the furnishings for the house there?

A        When she left, she didn't have anything, so my wife and I and her brothers -- her brother and sister-in-law and several members of the family and friends provided whatever she had.  She did buy a couple of small things, a couple of beds and it seemed like another item or two, but most of it was all provided by family and friends.

Q        Was Mr. Smith allowed visitation with the twins after the separation, pending the divorce?

A        Yes, it was on weekends.

Q        And --

A        And I'm not --

1     A             Yes, sir.

2     Q             Was that the tape you listened to?

3     A             Yes, sir.

4     Q             How can you tell that's the tape you

5 listened to?

6     A             I put my initials on it.

7     Q             Were you able to identify any of the

8 voices on that particular tape?

9     A             Yes, I was.

10     Q             Okay. Were you able to identify whose

11 voice was making the call?

12     A             It was the younger son, younger

13 grandson, Jason, was making the call.

14     Q             Okay. Were you able to determine whose

15 voice was in the background?

16     A             Yes, that was the older one, Chad.

17               GEN. THURMAN: If the Court, please, I'm

18 going to ask for identification purposes only it be

19 made an exhibit to his testimony.

20               THE COURT: Okay.

21               GEN. THURMAN: That it be Exhibit No. 1.

22               THE COURT: It will be No. 1 for

23 identification to Mr. Robirds' testimony.

24

25

```
1    A          Yes, I did.

2    Q          How long had they lived at that

3    particular address?

4    A          They moved there around mid-July.

5    Q          Did you know the defendant, Oscar

6    Franklin Smith?

7    A          Yes, I did.

8    Q          How long had you known Mr. Smith?

9    A          Since just prior to their marriage.

10   I think 1985.

11   Q          Okay.  So they were married in 1985; is

12   that correct?

13   A          (No response.)

14   Q          What name did Judy and her sons call Mr.

15   Smith?

16   A          Frank.

17   Q          Everybody in the family called him that?

18   A          Yes.

19   Q          What was the status of the marriage

20   between the Smiths at the time of your sister's death?

21   A          They were separated, going through

22   divorce proceedings.

23   Q          Do you know the date of the separation?

24   A          In June.  I'm not sure of the exact day.

25
```

                                                    1868

Q          On the day that they did, in fact, separate did you receive a call from any person?

A          Yes, my nephew Chad called to my mother's house and needed someone to come out there right away to pick them up.

Q          Did you respond to that particular call?

A          I did.

Q          Okay. How long did it take you to get to where they requested you to come?

A          About 30 minutes.

Q          And did you, in fact, find Judy Smith and her sons, Chad and Jason Burnett?

A          Yes, I did.

Q          And how far were they from the trailer where they had been living?

A          They were one -- about one mile from the trailer, walking down the road.

Q          Okay. How were they acting when you stopped to talk to them?

A          They were all very nervous to the point of hysterical, all of them talking at once. It was hard to get them to calm down enough to tell what had happened and what was going on.

Q          Were you able to get them calmed down enough where they could tell you what had happened?

A          Yes, they did.

1869

1    Q                Okay.  And what did they tell you
2    happened?
3    A                My sister was saying that they had been
4    in an argument, and it had escalated.  Frank and Jason
5    had gotten into a fight.  He had been trying -- he had
6    -- Frank was kicking Jason's legs and was trying to
7    kick him in the groin, then ended up biting him on the
8    back.  It escalated from there.  He told them to get
9    out, had got a gun out, had put it to Jason's head.
10   They had gone outside.  He shot the gun out in the air.
11   He told them to just get out.  And they all left.  She
12   was trying to get -- she did get her purse, but that
13   was all their belongings that they -- she was able to
14   get.  He told her not to get the car or try to get the
15   kids or he would kill 'em.  And if she took out a
16   warrant or brought the police up there, that he would
17   kill them.
18   Q                Where did you take them when you got
19   them back to Nashville?
20   A                When we got back to Nashville?
21   Q                Yes, ma'am.
22   A                We didn't actually come back to
23   Nashville.  First, we went to a phone up in the
24   Springfield area.
25

                                                        1870

Q          I understand that, but after you left the Springfield area where did you take them later that day?

A          We first went to the phone, trying to call the Crisis Center to find a shelter for battered women that she could go to. We were unsuccessful. All the shelters were full, so I did take her over to my sister-in-law's house and my brother's house.

Q          And how long did they stay there?

A          They stayed there only one night. Then they came over to my parents' house and stayed. They stayed approximately three weeks.

Q          Okay. Did they have anything other than the clothes on their back at that time?

A          No, they did not.

Q          Where did they move when they left your parents'?

A          To Lutie Street.

Q          Okay. And during this period of time of separation, did your sister ever express fear from any one person for her life and her childrens' lives?

A          Only from Frank.

Q          Did you personally ever hear any threats made by Mr. Smith to your sister or her sons?

A          No, not direct threats.

1871

```
 1   Q           Did you ever know Oscar Frank Smith to
 2   carry any type of weapons?
 3   A           Yes, he always had a knife on his belt,
 4   a case knife.
 5   Q           You're saying a case knife.  What kind
 6   of a knife are you talking about?
 7   A           Folding knife with a blade about that
 8   long (indicating with hands), about two to three inches
 9   long, the wide blade.
10   Q           And then in August of 1989, did your
11   sister have an occasion to go back to recover some
12   clothes and other items?
13   A           Yes, she did.
14   Q           Did you see her after she had done that?
15   A           Yes, I did.
16   Q           Where was that, please?
17   A           At my mother's house.
18   Q           Did you observe her condition at that
19   time?
20   A           Yes, she was very confused, in shock,
21   very -- almost down -- downgraded or feeling really
22   bad, mostly in shock.  She really didn't -- wasn't
23   hysterical, but she was so flat it was just hard to --
24   hard to explain how she was.
25
```

1872

```
1   Q                Okay.  Were you able to identify the
2   voice of the person who was actually on the phone
3   asking for assistance?
4   A                Yes, I was.  It was Jason Burnett, my
5   oldest nephew, I mean my youngest nephew.
6   Q                Were you able to identify the voice in
7   the background?
8   A                Yes, I was.  It was --
9   Q                And who was that, please?
10  A                It was Chad Burnett.
11  Q                Okay.  Were you familiar with your
12  sister's handwriting?
13  A                Yes.
14
15                   (Pause in the proceedings while
16                   Gen. Thurman shows documents
17                   to defense counsel.)
18
19  Q                (By Gen. Thurman)  Okay.  Let me hand
20  you these sheets of paper.
21
22                   (Document handed to the witness.)
23
24  Q                (By Gen. Thurman)  Can you identify the
25  writing on that piece of paper?
```

                                                              1880

1   A           This is just a photograph of the front

2   door as we saw it when we walked on the steps.    I

3   assume that would be called the porch, the front porch.

4   Q           And that is where located on the

5   diagram?

6   A           That is this location here (indicating

7   on diagram).

8   Q           And you entered through the front door?

9   A           We entered through the front door.    We

10  checked.    There was no forcible entry at the front

11  door.

12  Q           When you say "no forcible entry," what

13  does that term mean?    -

14  A           That means that it didn't appear that

15  anyone had broken in the house, the door was open, and

16  the lock was unlocked.

17              This next photograph is what we saw when

18  we walked in the front door, looking back down the

19  hallway in a north direction.    You can see the debris,

20  some of the debris, a belt, which is indicated in the

21  diagram.    And you can see the bathroom at the very back

22  of the house.    You can also see some bags of clothing,

23  which was not indicated on the diagram, because we

24  didn't feel like that was significant just to put on a

25  diagram.

                                                    1944

arm had been at one time. The blood had transferred from her arm to her blouse.

There was also something on the bed that we noticed immediately. And it was an impression made by a palm print, made by a person's hand. And it was at this location right here (indicating on photograph).

Q        You have noted that location over here (indicating on diagram)?

A        That's correct.

Q        All right.

A        We apparently --

Q        What were you --

A        We assumed that palm print was made in blood at that time.

Q        Okay. Now, what --

A        Okay.

Q        If you would, just point out what other observations did you have in that room?

A        After examining that particular body, without touching her or moving anything around, we decided -- I looked to the left and saw the victim's youngest son laying on the floor at the end of that bed. He was lying in approximately the same position that you see him in the diagram.

Something unusual or something brought

1947

```
1           (Gen. Blackburn holds up

2           photograph for the jury

3           to see.)

4

5           (Gen. Blackburn hands

6           the witness another

7           photograph.)

8

9           THE WITNESS:  This is also sitting

10   somewhere right behind Jason and like right close to

11   the heater.  And it's a disposable diaper box.  And the

12   reason that this was photographed, one reason was that

13   it did have blood splatter on it, indicating it was a

14   forcible splatter, which we would explain later.  And

15   also, if you look down into the box, you'll see a

16   yellow -- I mean a brown cotton glove that was found.

17   It was a lefthand glove.

18   Q           (By Gen. Blackburn)  Where on -- where

19   in this photograph was the blood?

20   A           The blood splatter itself was on the

21   box.

22   Q           Where's the glove?

23   A           The glove is inside the box.

24   Q           Right -- is that --

25
```

1954

A          The dark area is the blood itself.  It's very difficult to see from that angle.

Q          And that was found --

A          That was found right behind Jason, between Jason and the heater that you saw the blood on.

(Gen. Blackburn holds up

photograph for the jury

to see.)

(Gen. Blackburn hands

the witness another

photograph.)

THE WITNESS:  Okay.  This is the bedroom -- this is going to be the den across the hall.  I've indicated it as a den.  After leaving this particular room, I went out into the hall, along with Sergeant Robert Moore, went in this room.

And this is photographs of that room. This is photographed back in the direction that I came in.  This photograph was to depict, first of all, the location.  And secondly, it was to depict the location of a live round, a live cartridge, a .22 caliber cartridge that was found.  The cartridge is, of course,

1955

THE WITNESS: This is another angle
showing the table leg, also showing the awl that's
lying on a paper sack, which I didn't show in that
photograph. An awl is similar to an ice pick,
sometimes used in leather work, I believe, a tennis
racquet laying here, pizza boxes (holding up
photograph). There is also something we noticed that
may be -- might be of some significance, was a --
someone had prepared some food. It was on the counter.
There was only one bite that had been out of it. That
food was a piece of pizza and also a bologna sandwich.

(Gen. Blackburn holds up
photograph for the jury
to see.)

(Gen. Blackburn hands
the witness another
photograph.)

THE WITNESS: This is just another
angle, showing just a table as it was turned over,
showing the blood splatter on it. Large spots of blood
splatter like that is usually very low velocity coming
from a wound that's bleeding quite a bit.

1962

There was also a pen beside it. There was a pair of
blue jeans lying on the floor beside the bed. And if I
remember correctly, there was I.D. belonging to Chad
inside the pockets.

(Gen. Blackburn holds up
photograph for the jury
to see.)

(Gen. Blackburn hands
the witness another
photograph.)

THE WITNESS: Okay. This is another
photograph in Chad's room. This is the back door of
the house. There's only two doors to the house, the
front door that we come in, and this is the back door.
Again, we examined the back door for forced entry, and
we didn't find any. In other words, the door hadn't
been pried that we could tell or kicked in.

Q            (By Gen. Blackburn) Okay. And that is
at this location right here (indicating on diagram)?

A            That's correct.

Q            So the only doors to the house would be
one through Chad's room and the other through the front
door?

1970

consistent with arterial bleeding here, which is a
large quantity of blood. The small blood splatters
here on this was cast-off splatters. And there was
also a small splatter of blood here.

A bullet hole -- the last bullet hole
was found right here. Only a partial, a very small
fragment of that bullet was found. It was torn apart
when it was retrieved from the wall.

(Gen. Blackburn holds up
photograph for the jury
to see.)

(Gen. Blackburn hands
the witness another
photograph.)

THE WITNESS: There was an awl that was
found in the kitchen. This is a photograph of my
hands. I was trying to process it for fingerprints.
There was no fingerprints found on that particular item
that was identifiable.

(Gen. Blackburn holds up
photograph for the jury

1973

individual processing the items in the bedroom, such as the walls near the victims, anything that was smooth and non-porous that we could process for prints that particular night.

Q        Sergeant Hunter, what -- were you able to do anything at all with the footprint that was there in the kitchen, that was the bloody footprint?

A        No, that footprint was photographed and took back to our lab to be able to try to match it, but there wasn't enough detail to find out whose footprint that belonged to.

(Pause in the proceedings while Gen. Blackburn shows photograph to defense counsel.)

Q        (By Gen. Blackburn)  Sergeant Hunter, I would have --

THE COURT:  Gen. Blackburn, are you to a kind of a next stage in the questioning?

GEN. BLACKBURN:  Yes.

THE COURT:  Okay.  I think I might want to give the jury about a little ten-minute break here to let them kind of loosen up and so forth.  So let's -- we're going to -- this is going to go on a little

1979

1  Q                The one that has two fingers missing,
2  which hand is that?
3  A                That's the left hand.
4                   This is a photograph taken of abrasions
5  on the defendant's back (holding up photograph) and the
6  defendant's elbow.
7  Q                And you were taking these at the request
8  of the detectives that were there?
9  A                That's correct.
10 Q                Thank you, Sergeant Hunter.
11
12                  (WHEREUPON, the witness returns
13                  to the witness stand.)
14
15                  GEN. BLACKBURN:  Your Honor, I would
16 just request that these photos be Exhibit No. 11, a
17 collective exhibit.
18
19                  (State's Exhibit No. 11,
20                  eleven (11) photographs, marked
21                  and filed.)
22
23 Q                (By Gen. Blackburn)  Sergeant Hunter,
24 while you were in Robertson County, were various other
25 identication officers going to other places?

                                              1992

MR. DEAN:  Your Honor, I'd request any Jencks material.

THE COURT:  Go ahead.  All right. General Blackburn.

(Pause in the proceedings while
Gen. Blackburn hands Jencks
material to Mr. Dean.)

MR. DEAN:  It's fairly lengthy.

THE COURT:  All right.  Take your time.

GEN. BLACKBURN:  While he's reviewing that, could I ask Sergeant Hunter a couple more questions on something I forgot?

THE COURT:  Yes, go ahead and finish.

Q          (By Gen. Blackburn)  Sergeant Hunter, when you were comparing the latents found at the crime scene, were you able to identify the latents you found at the crime scene?

A          Yes, I was.

Q          And what, specifically, were the results of that comparison?

A          The results of that comparison was one latent fingerprint, No. 1 finger, which is the right thumb was identified to Judith Smith, recovered from

2021

Q          (By Gen. Thurman)  Okay.  And what
vehicle did you see in front of the house when you
passed it, please, sir?

A          It looked like a white LTD.  It looked
like an old police car, is what it looks like.

Q          Okay.

A          And a station wagon.

Q          How was it parked?

A          It was parked straight in.  I mean you
could see the back end of the car.

Q          Let me hand you a photograph that's been
marked State's Exhibit No. 11-A, and ask you if that
appears to be consistent with the car you saw that
night?

A          Yes, this is the car.

Q          And that's the car you saw parked that
particular night?

A          Yes, sir.

Q          Sometime between 11:00 and 11:15?

A          Right.

GEN. THURMAN:  If the Court, please,
that's all the questions I have, but I am going to ask
that that photograph be made an exhibit, the one that
he marked on.

THE COURT:  Okay.  Mark that.  The car
was already an exhibit, was that correct?

2150

Q          And was that warrant still pending on
October the 1st of 1989?

A          It was.

Q          When was the court date scheduled on
that warrant?

A          October 30th, 1989.

Q          Okay. And do you have a warrant dated
in August?

A          Yes, I do. It was issued on August 1st,
1989.

Q          What is the warrant number on that?

A          185-1027.

Q          Okay. And what is the charge on that
case?

A          Aggravated assault.

Q          Okay. And when was the court date on
that particular case?

A          It had been continued to October the
30th, 1989.

Q          Okay. And who was the alleged victim in
that case?

A          Judy Smith.

Q          Can I see those warrants, please?


          (Warrants handed to Gen. Thurman.)


                                        2191

GEN. BLACKBURN: Mr. O'Mara.

THE COURT: Mr. O'Mara, Les.

MR. ROD O'MARA was called, and being duly sworn, was examined and testified, as follows, to-wit:

DIRECT EXAMINATION

BY GEN. BLACKBURN:

Q        Please state your name.

A        Rod O'Mara.

Q        If you would, spell your last name for the court reporter.

A        O-'-M-a-r-a.

Q        Where are you employed, sir?

A        American General Life and Accident Insurance Company.

Q        And what is your position there?

A        I'm the Associate Director of Claims and Manager of the Life Claims area.

Q        And at my request, did you bring with you the policy that Oscar Franklin Smith had obtained that includes coverage on Judy Smith, Chad Burnett, and Jason Burnett.

A        Yes, I did.

2198

Q        If you would, please, look at that
policy, and first of all, would you tell us what type
of a policy it is?

A        This is a -- it's a joint whole life
policy.  It insured both Oscar F. Smith and Judy Smith
and the children, under a children's term coverage
writer.  Each -- each of the adults were covered for
$20,000 and each child for -- for $10,000.

Q        Okay.  And how many children are
included in that policy?

A        There's six children named on the
application.

Q        All right.  Now, with regard to Judy
Smith, the amount of coverage on her life would be
$20,000?

A        Right.

Q        Okay.  And as to Chad Burnett, $10,000?

A        Right.

Q        And as to Jason Burnett, $10,000?

A        Right.

Q        And when was this policy taken out?

A        The application for the policy was March
the 6th, I believe, yeah, March the 6th of 1989.

Q        And what type of renewal did that policy
have?

2199

MR. KEN HAMBRICK was called, and being duly sworn, was examined and testified, as follows, to-wit:

DIRECT EXAMINATION

BY GEN. BLACKBURN:

Q        Please state your name.

A        Ken Hambrick.

Q        If you would, spell your last name for the court reporter.

A        H-a-m-b-r-i-c-k.

Q        And what do you do for a living, sir?

A        I'm District Manager for Liberty National Insurance.

Q        All right.  And did you bring with you at my request records on the policies obtained on the life of Judy Smith, Chad Burnett and Jason Burnett, obtained by Oscar Franklin Smith?

A        Yes, I did.

Q        If you would, what type of a policy was that?

A        This was a family type policy, where it insured the applicant, Oscar Smith, his wife, Judy Smith, and the children.

2207

Q                    Okay.  How many children were included
in that policy?

A                    I don't have that -- excuse me -- I do,
too.  They -- all the children, stepchildren and
children of the marriage.

Q                    And what was the value of the life of
Judy Smith?

A                    $20,000.

Q                    And as to Chad Burnett?

A                    $5,000.

Q                    And as to Jason Burnett?

A                    $5,000.

Q                    Okay.  So a total of $30,000?

A                    That's correct.

Q                    When was this policy obtained?

A                    This policy was applied for on
February the 2nd of '89.

Q                    And who was the beneficiary of -- on the
lives of Judy Smith, Chad Burnett and Jason Burnett?

A                    Oscar Smith.

Q                    And when was -- what type of renewal did
that policy have?

A                    It was a monthly premium policy, where
he paid the premium each month.

2208

THE COURT: Mr. Watts.

1

2          MR. JERRY WATTS was called, and being

3   duly sworn, was examined and testified, as follows,

4   to-wit:

5

6   DIRECT EXAMINATION

7   BY GEN. THURMAN:

8

9   Q          State your name for the Court, please.

10  A          Jerry Watts.

11  Q          And how are you employed, Mr. Watts?

12  A          I work for an electrical distributor

    here in town.

13  Q          And were you at one time employed at

14  Maintenance Service Corporation?

15  A          Yes, sir.

16  Q          And did you know the defendant, Oscar

17  Franklin Smith?

18  A          Yes, sir.

19  Q          How long have you known Mr. Smith?

20  A          At that time, approximately 12 months.

21  Q          And did you and Mr. Smith become

22  somewhat friends while you were working at Service

23  Maintenance Corporation?

24

25

                                                    2229

A          Yes, sir.  He was a work associate with me.  We would talk during lunch hour, basically, daily or every other day during the week..

Q          And did you have an occasion to see Mr. Smith use a knife at work?

A          Yes, sir.  Mr. Smith would come into my office occasionally and have lunch.  And he would make sandwiches and put his mayonnaise on his sandwiches with a -- with a knife.  And also, one instance, he came in, and Mr. Smith has two fingers missing on his left hand.  And he asked me to cut two fingers  off with a knife, off of his gloves, so he wouldn't get it stuck in some machinery.

Q          And could you just describe that knife?

A          It appeared to be a long buck knife, brass tips, wooden style handle, maybe three and a half, four inches long.

Q          And did you also have an occasion to see some guns that belonged to Mr. Smith?

A          Yes, sir.  Mr. Smith, we were talking one day.  And I had spoke about buying the pistol.  And he said he had one for sale, that it was a little -- in bad shape, but he still was thinking about selling it, and that he was going to a local gun range to fire, and for me to meet him there, and we would fire at some targets.  And I did meet Mr. Smith there.  And he was

2230

already there when I arrived. I went downstairs, and
he was already shooting. And I used his weapons to
fire at the targets.

Q          And what -- what weapons were there that
you can testify about?

A          He had four -- four weapons. He brought
four with him. One was a .22 caliber rifle with a
scope, lever action. One was a 9 millimeter handgun, a
Smith and Wesson, I believe. One was a 9 millimeter
Intertact 9, which is an assault pistol, and one was
a .22 style revolver, a western style revolver, in a
leather holster.

Q          Okay. Can you just describe that
holster for us?

A          It was detailed; it looked like someone
had made it, you know, a leatherworker of some sort,
had -- also had a little string that went around the
trigger, I believe, to keep it from falling out of the
holster.

Q          Did you discuss this holster with Mr.
Smith?

A          No, sir; other than when we was getting
ready to leave, he had -- he had put his weapons up.
And he said this was his -- his baby, and that he had
tooled the holster himself.

                                                    2231

wife and children?

A    Yes, I did.

Q    And if you would, what was the amount of insurance on his wife, Judy Smith?

A    The amount on Judy Smith and himself was $10,000.

Q    Okay.  On her it would be $10,000.

A    $10,000.  Normal death, $20,000, accidental.

Q    And Chad and Jason Burnett, what was the value -- the amount on the life of Chad Burnett?

A    $4,000.

Q    And Jason Burnett?

A    $4,000.

Q    And when was this policy obtained?

A    It was obtained August 28th, 1985.

Q    Okay.  And how was it paid?

A    Paid by monthly.

Q    Monthly?

A    Yes, ma'am.

Q    Okay.  And do your records reflect when the last payment was made?

A    I believe it was September of -- of last year.

Q    September, 1989?

2248

Q          Okay.  Did he ever talk about his hobby
that he had, about anything that he could do as far as
a craft or a hobby?

A          Yes, he mentioned he was into leather
crafts.  He had showed me a belt that he had made.

Q          Okay.  What did you notice that was
unusual to you about the belt?

A          The belt had said "Frank" on it and--

Q          And what name did you know Mr. Smith by?

A          Oscar.

Q          Did you question him about why he had a
belt with the name "Frank" on it?

A          Yes, I did.

Q          What did he tell you?

A          He said his real name was Frank.

Q          And that was the first time that you had
known that?

A          Yes.

Q          Back in September of 1989 what type of
car was he driving?

A          It was a white Ford, an old squad car.

Q          And do you recall when his wife and two
stepchildren were killed on October the 1st?

A          Excuse me?

2253

Q        Do you recall when his wife and
stepchildren were killed on October the 1st, 1989?

A        Yes, I do.

Q        Prior to their death, did you and Mr.
Smith have any unusual conversations?

A        Yes.

Q        Okay.  When was the first one?

MS. PARSONS:  Your Honor, I'd object to
this and ask for an out of jury hearing.  Hearsay.

THE COURT:  Okay.  Let the jury --
instead of us going out -- well, let's just --

GEN. THURMAN:  We can have a bench
conference, Your Honor.

THE COURT:  Let's let the jury step out
here for a minute.  Why don't you all go this way where
you don't have to go up the steps, and I'll see you in
just a couple of minutes.


        (WHEREUPON, the jury retired from
        open court at 9:38 a.m., and the
        further following proceedings
        were had, to-wit:)


THE COURT:  Okay.  Ms. Parsons, what is
the basis of your objection?

MR. NEWMAN:  Your Honor, we --

2254

```
                    (WHEREUPON, the jury returned

                    to open court at 9:46 a.m.,

                    and the further following

                    proceedings were had, to-wit:)


                    THE COURT:  Okay.  Go ahead, Mr.

Thurman, please.

Q                   (By Gen. Thurman)  Mr. Merritt,

approximately a month before the death of

Judith Lynn Smith and her two sons, did you and Mr.

Oscar Frank Smith have a conversation?

A                   Yes.

Q                   About this?

A                   Yes.

Q                   And what was the nature of that

conversation?

A                   He had asked me at that time if I had

knew anyone that would kill his family.

Q                   Where did you live prior to coming to

work?

A                   Chicago.

Q                   How long did you live there?

A                   Eight years.

Q                   Okay.  What was your response at that

time?
```

2264

| | |
|---|---|
| A | I didn't really take him serious at the |
| | time. |
| Q | What did you say? |
| A | What did I say to Mr. Smith? |
| Q | Yes. |
| A | I just told him that I didn't know of |
| | anyone. |
| Q | Did he then approach you again? |
| A | Yes, two weeks later. |
| Q | And what was the nature of that |
| | conversation? |
| A | He had told me he would offer |
| | $20,000 to have someone kill his family. |
| Q | Did he specify who that time in the |
| | family? |
| A | Judy Smith and the two stepchildren. |
| Q | And did he specify anyone that was not |
| | supposed to be killed? |
| A | Yes, his two twins. |
| Q | What was your response at that time? |
| A | At that time I told him I think he has |
| | serious problems, and I thought he should get |
| | professional help. |

GEN. THURMAN: That's all the questions I have.

THE COURT: Okay. Mr. Newman.

2265

Q        Okay. And where did he request you to go with him when he approached you?

A        Well, he was wanting me to go for a ride with him at break time.

Q        And did you do that?

A        Yes, I did.

Q        Did you just get out and ride around the countryside there?

A        Yes, sir; we just rode around.

Q        Okay. And what did Mr. Smith say to you while you were riding around at break time?

A        Well, he said that we could take care of each other's problem, that he'd kill my wife and I'd kill his wife.

Q        Okay. What was your response?

A        I told him it was a joke. I didn't really mean it.

Q        Okay. Did he later come by your house?

A        Yes, sir.

Q        And how long was that after this first conversation?

A        I think it was about two weeks; I don't really remember, but it's --

Q        Were you living in Lebanon at that time?

A        Yes, sir.

2288

Q      So he came all the way to Lebanon?

A      Yes, sir; he did.

Q      Okay.  And did you have a certain conversation at that time?

A      Yes, sir; he brought this thing up again, said he was real serious about this and wanted to do it.  And he told me that we could set the thing up where I -- I could be gone, and he'd do mine first, and then I could be out of town, somewhere where I wouldn't be suspected of it.  And I -- I could do his, and he'd do the same way.

Q      He would go out of town while you killed his --

A      Yes, sir.

Q      Did he talk about whether he could pay anybody?

A      Well, I -- I told him that, you know, this is a joke with me.  I told him this is a joke, totally.  And he said, well, I could make it worth your while.  He said, I'd get some money up.  And I just told him I -- I didn't want to talk about it anymore. I refused to have anymore to talk about it at all.

Q      So you terminated all that conversation?

A      Yes, sir.

GEN. THURMAN:  That's all the questions I have.

2289

1   Q            Did you have conversations with Mr.

2 Smith?

3   A            Yes, sir.

4   Q            And were you all working together after

5 Judy and Frank Smith were separated in June of 1989?

6   A            Yes, sir.

7   Q            And during that period of time, prior to

8 her death, did you have an occasion to listen to

9 certain phone conversations between Judy Smith and

10 Oscar Frank Smith?

11   A            Yes, sir.  I did.

12   Q            And how did you know it was Oscar Frank

13 Smith on the other line?

14   A            Because he called Judy, and when he

15 called, she would get real upset, and she would ask me

16 to listen in.

17   Q            Okay.  Did you recognize his voice?

18   A            Yes, sir.

19   Q            And why were you listening in?

20   A            Because he had threatened to kill her,

21 and she asked me to be a witness to this.

22              MR. DEAN:  Your Honor, if we could

23 aprroach the bench, please.

24              THE COURT:  Let's just step in the

25 office for a second.  Hang in there with me just for a

2309

it was about six weeks prior to that.

THE COURT: All right.

THE WITNESS: Four to six weeks. I'm not sure of the dates.

THE COURT: Okay. Sometime in the Summer of 1989?

THE WITNESS: Yes, sir.

THE COURT: Go ahead, Mr. Thurman.

Q     (By Gen. Thurman) So is that the first time you started listening to the calls?

A     Yes, sir.

Q     In the Summer of 1989?

A     Yes, sir.

Q     And how many different calls did you actually listen in on?

A     Around 12 to 15 different calls.

Q     And was there anything said in a threatening nature at all during any of these calls?

A     Pardon me now?

Q     Were there any threats made during these calls?

A     Yes, sir; there was.

Q     Okay. Can you just describe what was said?

2317

A          For instance, one night Frank called on a Friday night. And we were always busy on Fridays. Judy called me to the phone, and I went there. And I listened to him, and he said that she would never know, her and I neither, when he was sitting across the road at Shoney's ready to blow her brains out.

Q          How many times over the period of this -- these calls was Judy Smith's life threatened?

A          Oh, at least 12 of those calls he threatened her life.

Q          Okay. How would he threaten to kill her?

A          Everytime but one he threatened to shoot her. Once he threatened to stab her.

Q          During these calls were any references made to her sons, Chad and Jason Burnett?

A          One time, he threatened to kill Chad and Jason, because he said that she was better to them than he was -- she was his twins.

Q          Was that towards the end of these calls or back at the first of the calls?

A          Probably about the third to fourth week.

Q          So these calls were continuing, ongoing?

A          Yes, sir.

Q          And when was the last conversation you heard?

2318

Q           Okay.  Did you do that?

A           Yes, sir.

Q           Okay.  And who was present when you arrived?

A           When I arrived at the residence of Oscar Smith, two young twin boys that was described to me, and Mr. and Mrs. Smith, Oscar's parents, and I don't recall who else.  Sergeant on patrol, he was with me when I arrived.

Q           Okay.  And did you request Mr. Smith to do anything at that time?

A           Yes, sir; I stopped in the drive of the house and called him over to my car and told him that Metro officers had contacted me, and that they wanted to talk to him, and that I asked him to get in the car with me and ride to the interstate to meet with the Metro officers.

Q           Did he do that?

A           Yes, sir.

Q           At any time did he ask you why they wanted to question him or anything about that?

A           No, sir.

Q           Did you at any time tell him why they wanted to question him?

A           I told him that I did not know what the reason was that they'd called and wanted to talk to

2334

A          Originally, I was dispatched on the call, the original call.

Q          But once you got to the scene, where were you then sent?

A          To the City of Springfield.

Q          And what was your purpose in going to the City of Springfield?

A          Myself and Detective Mike Smith went to the City of Springfield or Rutherford County or Robertson County to interview Mr. Oscar Frank Smith.

Q          Okay. And had you previously requested ahead for assistance by Detective Bennett?

A          Yes, sir.

Q          And where did you observe Mr. Smith? Where did you find Mr. Smith?

A          When we got off the interstate, Detective Bennett was there with Mr. Smith. We then went from that location prior to talking to him to the Robertson County Sheriff's Department.

Q          And at that time did you advise Mr. Smith why you wanted to talk to him?

A          No, sir.

Q          Did he ask you at that time why you wanted to talk to him?

A          No, sir; he did not.

2338

to come back on in and just have a seat.

                    (WHEREUPON, the jury returned
                    to open court at 12:33 p.m.,
                    and the further following
                    proceedings were had, to-wit:)


                    (The witness retakes the stand.)


                    THE COURT:  Okay.  Go ahead, Mr.
Thurman.
                    GEN. THURMAN:  Thank you, Your
Honor.
Q                   (By Gen. Thurman)  Detective Bernard, I
think we were to the juncture where you were at the
police department in Springfield; is that correct?
A                   Yes, sir.
Q                   And at that time, had you advised Mr.
Smith why you were interviewing him, what the
circumstances were?
A                   No, sir; I had not.
Q                   Had he asked you at any time why you
were interviewing him?
A                   No, sir; he did not.

                                                    2349

Q       Did he tell you how long it took him to get there?

A       Approximately seven hours.

Q       Okay. Did he tell you why it took that length of time?

A       He stated that he ran into some fog on the way.

Q       How long did your interview last with him?

A       I believe it was 35 minutes.

Q       And during this initial interview, did you notice anything unusual about the interview?

A       During the interview itself, I noticed that Mr. Smith was shaking, he was smoking quite a bit. During the interview, the words -- he referred to the victim as well as any incidents concerning her in the past tense. He stated that we were getting back together, things were going well. At one point he mentioned a marriage counselor, that they were seeing a marriage counselor. And he stated that we were seeing a marriage counselor. When I asked him when did they stop seeing the counselor, he stopped for a few minutes and stated we're still seeing the counselor.

Q       He used the word "were" repeatedly?

A       Yes, sir; he did.

2353

Q          And did you observe any other unusual
behavior after he was -- when did you advised him of
why you were asking him the questions?

A          Approximately 35 minutes after we
originally walked in and I identified myself.

Q          Okay.  What was his reaction when you
advised him of his wife's death and the childrens'
deaths?

A          He didn't ask any questions about the --
about the children; he didn't ask any questions about
the victim, as such as what happened or where it
occurred or anything such as this.

          At one point Detective Smith, Detective
Bennett had gone to separate rooms, and I'd stepped
outside.  And we asked Mr. Smith to sit in the little
waiting room area, which is right in the front door of
the Sheriff's Department.  I was standing outside, in
the parking lot, approximately 35, 40 feet away.  There
were some other deputies down a ways from the front of
the door.  Mr. Smith was sitting in a straight chair by
the front door, with the door open.  I'd walked into
the shadows and was watching him, to make sure that
either he didn't try to leave or run away or whatever,
due to the fact that we'd just told him about this
death.  I observed him smoking a cigarette with his
left hand.  He would smoke the cigarette, would take a

                                        2354

draw or two off the cigarette and hold it in these two
fingers here. Then he would take these two fingers and
blow smoke onto these fingers here and then rub them in
each eye, like this (indicating). And then he called
me over, called -- said, Detective Bernard, and asked
me, said, "tell me it's not true," assuming -- meaning
to the -- referring to the deaths. At that time he did
have a tear on each eye.

Q        And did you observe any injuries on him
that particular night?

A        Yes, sir; I did.

Q        And what were those, please?

A        There was some abrasions on his right
hand, his right elbow, and his left back and left
shoulderblade.

Q        I'd hand you these photographs that have
been previously marked 11-K, 11-I, and 11-J, and see if
you can identify those.


                    (Three (3) photographs handed
                    to the witness.)


            THE WITNESS: Yes, sir; these were the
photographs that I requested to be taken of Mr. Smith,
of the injuries that I noted.

                                        2355

Q            (By Gen. Thurman)  If you could,
Detective, could you step down before the jury and just
point out the injuries that you've just testified to?

                    (WHEREUPON, the witness steps

                    down from the witness stand

                    and stands at the jury box.)

                    THE WITNESS:  The injury here is an
abrasion to the outside right arm (indicating on
photograph), in the area of the elbow (holding up
photograph).

                    These are two --
Q            (By Gen. Thurman)  You might want to
come on down in front where everyone can see you.

                    THE COURT:  Come right in the middle,
maybe, if you would.

                    THE WITNESS:  These are three scratches
to Mr. Smith's right hand, three abrasions.  There's a
half moon-shaped abrasion to the right little finger.
There's an abrasion on the top knuckles of the right
hand, and another abrasion or scratch between the --
the thumb and the first finger (holding up
photograph).

                    This is Mr. Smith's back, on the left
side.  This would be the left side of his back, what

                                                 2356

appears to be an abrasion or a scrape. At the top
here, the left shoulderblade is the beginning of what
appears to be a bruise (holding up photograph).

In case anyone didn't see it at the
beginning, this is his right arm, his right elbow, and
the outside (holding up photograph).

Q        (By Gen. Thurman)  Go back.

(WHEREUPON, the witness returns
to the witness stand.)

Q        (By Gen. Thurman)  Did you ask Mr. Smith
about a knife, about whether he carried a knife?

A        Yes, sir; I did.

Q        And what was his response?

A        Never.

GEN. THURMAN:  That's all the questions
I have.

THE COURT:  Give him the pictures over
there.

MR. DEAN:  Your Honor, I'd request any
Jencks material of this witness.

THE COURT:  Mr. Thurman.

2357

(Jencks material handed to

Mr. Dean.)

CROSS-EXAMINATION

BY MR. DEAN:

Q          Detective Bernard, you asked Mr. Smith about what he did on Monday, I guess the day that you were interviewing him; is that correct?

A          Yes, sir.

Q          And I think your report would reflect that he told you that he had slept for approximately two and a half hours?

A          I believe it was a little bit longer than that. I think it was somewhere between 3:00 and 5:30 or 6:00.

Q          5:30 to 6:00?

A          I believe it was about 6:00, yes, sir.

Q          If I could show you the report, and ask you if you could identify this copy of the report you prepared?

A          Yes, sir; it is.

Q          Would you look at approximately -- I think it's the second or the third paragraph from the bottom?

2358

October.

1   Q           Detective Flair, I'd have -- hand you
2   this item, which has been identified as Exhibit 21 for
3   identification only, and ask you if you can identify
4   that?
5   A           That's correct, ma'am. This is the
6   holster that I found inside Mr. Smith's trailer.
7   Q           Where exactly was that located?
8   A           This was hanging in the -- I would call
9   it the main or master bedroom, if you will, of the
10  trailer, hanging in -- in the wall -- or I'm sorry --
11  on the wall.
12  Q           And why was it that you collected that
13  particular item?
14  A           Well, there was -- at the original crime
15  scene, it was learned that there was a weapon, a pistol
16  used. And we were trying to ascertain, possibly, if
17  this -- this holster could have, you know, be involved
18  or if we recovered the pistol at a later date.
19  Q           Did you ever -- did you recover a pistol
20  with that?
21  A           No, ma'am; I did not.
22              GEN. BLACKBURN: Your Honor, I'd request
23  at this time that that be made an exhibit to his
24  testimony.
25              THE COURT: Okay.

                                              2366

1      (State's Exhibit No. 21,

2      holster, marked and filed.)

3

4      (Pause in the proceedings while

5      Gen. Blackburn shows two (2) belts

6      and a leather item to defense counsel.)

7

8      Q          (By Gen. Blackburn)  Detective Flair,

9  I'll hand you three other items, and ask you if you can

10  identify those?

11      A          Yes, ma'am; these are the three other

12  items that I recovered from the -- inside the trailer.

13  They were as well, if you will, in the main bedroom of

14  the trailer.

15      Q          And this is the defendant's trailer?

16      A          That's correct; yes, ma'am.

17      Q          If you would, what -- describe what each

18  of those items are.

19      A          Well, this is just a leather work, and

20  it has, if you will, imprinted on it, "Home Sweet

21  Home."  The other two are -- appears to be trousers, a

22  belt for trousers, and it's got the word "Frank"

23  imprinted on the back of both of them.

24

25

2367

Q            Okay. If you would, hold them up to the
Ladies and Gentlemen of the Jury.

A            (Holding up items).

Q            And both of the names "Frank" are
imbedded in there --

A            Printed -- that's correct. "Frank"
here, F-r-a-n-k on the back on that one and this one as
well.

Q            And where exactly did you find those in
the trailer?

A            These were in the bedroom, hanging on
the wall.

            GEN. BLACKBURN: Your Honor, if that
could be made Collective Exhibit next in order.

            THE COURT: Okay.


            (State's Exhibit No. 23, two

            (2) belts and leather-worked

            item, marked and filed.)


Q            (By Gen. Blackburn) The court officer
is going to hand you this item and ask you if you would
look at that and see if you could identify that?

A            Yes, ma'am; this is a .22 caliber live
round and has a slip of paper on the inside of it with
my initials, and it was behind -- this was found behind

                                        2368

the gun case of the main living area.  It's got it

marked here, and that is my writing, and that's how I

tagged it when I located it.

Q             And it's a live .22 round?

A             Yes, ma'am.  That's correct.

             GEN. BLACKBURN:  Your Honor, if that

could be State's Exhibit next in order.

             THE COURT:  Okay.

             (State's Exhibit No. 24, live

             .22 round, marked and filed.)

Q             (By Gen. Blackburn)  Now, there is a box

that I need to have handed to you.  It's sort of heavy,

and ask you if you can look in that and see if you can

identify the items that are in that box.

A             Yes, ma'am; these are, if you will,

leather-working tools.  There are several leather-

working tools that are used in leather work.  They've

also got -- they're several pieces of metal work that

you use as a stamp to spell out a word.  Like here's an

"E", and there's several -- an alphabet, if you will.

And there's numerous other -- I don't know the correct

pronunciation or the correct term for them, but I would

call it something like a stamp.  If you took this and

                                              2369

put it on leather, hit it so it would have an
impression of whatever design was here. And this
happens to be a bird. And there's --

Q          Where did you locate those items?

A          These were found in -- in an
outbuilding about 15 to 20 feet from Mr. Smith's
trailer.

GEN. BLACKBURN: If you would -- Your
Honor, that would be the State's next exhibit.

(State's Exhibit No. 25, box
containing assorted leather-
working tools, marked and
filed.)

Q          (By Gen. Blackburn) Detective, let me
hand you some photographs.

(Pause in the proceedings while
Gen. Blackburn shows five (5)
photographs to defense counsel.)

Q          (By Gen. Blackburn) And see if you can
identify them.

2370

(Five (5) photographs handed
to the witness.)

Q          (By Gen. Blackburn)  A series of five
photographs and see if you can look at those
photographs and see if you can identify them.

A          The first three photographs are
photographs of tennis shoes that I extracted from the
trailer there at Mr. Smith's residence.  The other two
photographs is a partial piece of a tennis shoe that
was found in what I would call a small firepit,
located just behind the trailer, another 15 to 20 feet
away from Mr. Smith's trailer.

Q          Okay.  And what was your purpose for
collecting those particular items?

A          To see possibly if there was any type of
link back to the original crime scene.

Q          And you were collecting all the tennis
shoes that you found at the trailer?

A          Well, first of all, it was rather odd
that there was a tennis shoe that was -- that was
partially burned, as it -- maybe it might have been
thrown in the fire and could have been to be destroyed
or whatever.  We didn't collect any and all shoes, but
the tennis shoes we were interested to see if, again,

2371

Q          Please state your name.

A          My name is Mona Gretel Case Harlan.

Q          You might have to speak up, both of us have a tendency to talk a little low. What is your occupation?

A          I am a licensed physician in the State of Tennessee, currently serving as an Assistant Davidson County Medical Examiner.

Q          And what is your educational background?

A          My educational background is that of high school, college, medical school, finishing in 1974. I did a pathology residency at the University of Tennessee in Memphis. I finished that in 1978, became anatomic and clinical board certified, worked as an Assistant Shelby County Medical Examiner while there, and worked as an Assistant Davidson County Medical Examiner part time beginning in the Fall of 1983 and full time beginning in May of 1986.

Q          And as part of your duties as an Assistant Medical Examiner, are you required to do autopsies?

A          I do autopsies, quite a few of them.

Q          About how many?

2559

1    A                    This year it's going to be about 200.

2    Q                    Okay.  And during the course of that,

3    are you required to determine the cause of death?

4    A                    Yes, this is our primary reason for

5    doing the autopsy, is to determine the cause and manner

6    of death.

7    Q                    And as your job as an Assistant Medical

8    Examiner, are you also required to testify with regard

9    to the results?

10   A                    Yes, I am.

11   Q                    Okay.  And have you been so qualified as

12   an expert in your field of forensic pathology?

13   A                    I have been qualified in courts in

14   Davidson County, additional counties in Tennessee and

15   in Kentucky, as an expert in forensic pathology.

16                        GEN. BLACKBURN:  Your Honor --

17                        THE COURT:  Excuse me just a minute.

18   I'm not sure -- my clerk has reminded me whether or not

19   Dr. Harlan was sworn in the presence of the jury?

20                        THE WITNESS:  I was not.

21                        THE COURT:  I think she wasn't.  So let

22   me ask her now just for the purpose of the record and

23   for the jury's benefit if you would be sworn, Dr.

24   Harlan.

25

                                                    2560

(The witness is sworn by the
1
                    Clerk.)
2

3                   GEN. BLACKBURN:  Your Honor, at this
4        time I'd offer Dr. Harlan as an expert in her field.
5                   THE COURT:  All right.  Mr. Dean, do you
6        have any questions?
7                   MR. DEAN:  No problem.
8                   THE COURT:  Okay.  Dr. Harlan has
9        testified as an expert in this Court a number of times.
10       And she will be allowed to testify today in her field.
11                  GEN. BLACKBURN:  Okay.
12                  THE COURT:  Okay.  Go ahead.
13       Q         —         (By Gen. Blackburn)  Dr. Harlan, in
14       performing autopsies, would you just explain to the
15       Ladies and Gentlemen of the Jury exactly what -- what's
16       required or what you do during the course of that.
17       A                 Yes.  An autopsy consists of several
18       phases.  First, we try to view the body as soon as
19       possible after its discovery, take into account
20       surroundings, clothing, etc.  We document our findings
21       with photographs.  We then remove the clothing, weigh
22       and get a height of the body, examine externally for
23       any injuries present externally, and then do a complete
24       autopsy, in which we examine the contents of the head,
25       the neck, the chest and the abdomen.

                                                        2561

1   With examination of the organs, we also
2   retain small pieces of the tissue, which we have made
3   into microscopic slides that we examine beneath the
4   microscope.  In addition to that, we also take
5   pertinent samples for such things as cultures to see if
6   there are bacteria growing in cases in which we suspect
7   an infection and toxicology samples to determine what
8   drugs or alcohol or anything such as that are present
9   and to determine the blood type.
10  Q          And during the course of all this, first
11  of all, are you required to do autopsies where the
12  cause of death is suspected to be a homicide?
13  A          Yes, I am.
14  Q          Okay.  And that would be in all cases?
15  A          In almost all cases.
16  Q          In almost all cases.  Let me direct your
17  attention to October the 2nd of 1989, and ask you if
18  you had an occasion to do -- to perform an autopsy on
19  the bodies of Judith Smith, Jason Burnett and Chad
20  Burnett?
21  A          I performed autopsies on Judith Lynn
22  Warden Smith and -- beginning on October the 3rd at 5
23  p.m.  I did an autopsy on Chad Altman Burnett
24  beginning October the 3rd at 11 a.m., and on Jason Don
25  Burnett, I did an autopsy beginning at 1:30 a.m., on

2562

October the 4th.

Q          Had you, though, been made aware of
their being deceased, though, on October the 2nd?  Had
your office been notified of the discovery of their
bodies on October the 2nd?

A          Yes, we had.

Q          And had you or any individual of the
Medical Examiner's staff gone to the scene at 324 Lutie
Street?

A          Yes, my husband Charles did.

Q          And did you go to the scene at that
time?

A          Not at that time.

Q          Did you later go to the scene?

A          I did go to the scene.

Q          Okay.  If you would, you indicated that
you did the autopsy on Judith Smith first; is that
correct?

A          I believe I did the one on Chad Altman
Barnett or Burnett first.  Yes.

Q          Why don't we just take them in the order
that you did them.

A          All right.

Q          If you would, you indicated that the
first thing you do is you make a visual observation
analysis?

2563

1  A          Yes.  I examine the body clothed,

2  unclothed, and photograph the body, make diagrams and

3  pertinent notes concerning my findings at that point.

4  Q          All right.  Describe when you first

5  viewed the body of Chad Burnett what you observed.

6  A          On Chad Burnett, as I first examined

7  him, the body was still clothed, had quite a bit of

8  blood on the clothing.  I charted what injuries I could

9  see easily with the body in that shape, weighed and

10  measured him, then removed the clothing, still charting

11  the body and then cleaned off the skin so that I could

12  get a better look at the wounds to the skin.

13  Q      _   And what were the wounds that you

14  observed?

15  A          He had several different types of

16  wounds.  He had multiple gunshot wounds, one of which

17  that I called Gunshot Wound A, which was to the inner

18  edge of the left eyebrow.  And it was a contact type of

19  gunshot wound, which shows a small bruising of the

20  orbit or orbital contusion beneath it.

21  Q          Dr. Harlan, let me interrupt you.  What

22  is a contact gunshot wound?

23  A          A contact gunshot wound is a wound in

24  which the muzzle of the gun is against the skin's

25  surface.

2564

Q          Okay. So that the actual muzzle of it would be pressed against the skin's surface.

A          In Chad's case, it was against the skin's surface but was not in tight contact.

Q          Okay. And you can tell the difference?

A          Yes, I can.

Q          What was the next observation that you noticed?

A          I then examined the remainder of the body and found another gunshot wound, which I called Gunshot Wound B, which was to the right upper chest. And it was also a contact gunshot wound. In addition to this wound, which had no exit wound, nor did the Gunshot Wound A, I discovered another gunshot wound to the top of the right shoulder, which I called Gunshot Wound C, which had an exit wound to the back of the right shoulder, actually base of the neck area, which I called Gunshot Wound D.

          Gunshot Wound C was somewhat different from the other two gunshot wounds, in that it was not straight in, went at a -- a marked angle and did not show obvious gross powder present.

Q          Okay. So you've got the contact wound to the -- to the face.

A          Correct.

1   Q              One to the chest area, and then the
2   other is not a contact wound?
3   A              The other has to have been fired from
4   more than two feet away or had to have gone through
5   some other target first.  And I did not find a defect
6   in his shirt to explain that.
7   Q              So he had three separate gunshot wounds
8   to the body of Chad Burnett?
9   A              We do.
10  Q              What were the other -- the injuries that
11  you could observe?
12  A              In addition to those wounds, he had
13  multiple stab wounds which were in three different
14  types.  Some of these were stab wounds that
15  appeared to have been caused by something that was very
16  sharp and needle-like and elongated and had no side
17  edge to it, something such as an ice pick or an awl or
18  a -- something sharp and pointed.  He had one such
19  wound at the chest, beneath the area where the
20  clavicles come toward the midline here (indicating on
21  self), and had a small trail-off from that, a little
22  abrasion down towards the right side.
23                 He had multiple additional -- additional
24  small abrasions but none that were definitively made by
25  a puncture type instrument.  In addition to these, he

                                                    2566

had several stab wounds that were made by something
with a blade shape to it. One of these was in the --
what we call the lumbar area of the back, in the small
of the back, above the pelvis, in the midline, and was
orientated across or transverse in comparison to the
body.

Two others were just above and on either
side of the umbilicus or belly button, made with a
smiliar type of instrument, and a third type of injury
from a sharp object such as that was also present, but
this was a laceration type injury or series of
laceration type injuries to the neck. And in these
there were a small abrasion, superior, then a bigger
laceration or incision that had some frayed edges to
it. Then along its left edge it had another small,
what we call abrasion or scrape, and then beneath and
about mid-neck or high mid-neck an even larger area of
slashing type injury with edges on it that suggested
more than one cut.

Q               Dr. Harlan, let me ask you this. After
you are making these visual observations, are you
documenting these on a chart in some manner?

A               Yes, I did, at the -- at the autopsy,
document these on Special Chart 11, which is a form
that we use, and Special Chart 8, which is the second
form.

```
 1                    (Chart is brought to the front

 2                     of the jury box.)

 3

 4      Q              (By Gen. Blackburn)  Dr. Harlan, can you

 5      look at this chart--

 6                     MR. NEWMAN:  Your Honor, if I could

 7      interrupt, with the Court's permission, could I move

 8      around so that I could see?

 9                     THE COURT:  Sure, move right over here

10      in this chair, if you want to.

11      Q              (By Gen. Blackburn)  And ask you if this

12      appears to be an enlargement of that chart that you

13      have prepared with regard to Chad Burnett?

14      A              Yes, it is.

15      Q              If you would, step down in front of the

16      chart and point out to the Ladies and Gentlemen of the

17      Jury the wounds that you've just been describing.

18

19                     (WHEREUPON, the witness steps

20                      down from the witness stand

21                      and stands at the board.)

22

23                     THE WITNESS:  This is a separate chart

24      that I used that simply indicates the relative shapes

25      of the wounds, the size of the injuries.  I try to
```

2568

tabulate their inches above the heel. And Chad was a total of 170 pounds, that is, 170.6 pounds, and 71 inches tall, which would be 5'11".

Q          (By Gen. Blackburn)  So both of these charts are with regard to Chad Burnett, this being just a documentation of the larger chart of the type of wounds?

A          Yes.

Q          You use this in conjuction with that? If we could scoot it over, to this side. Now, Dr. Harlan, if you would, go through each one of the wounds that you observed on Chad Burnett and just tell the Ladies and Gentlemen of the Jury about each of them.

A          The gunshot wounds are --

THE COURT:  Dr. Harlan, would you like a pointer?

THE WITNESS:  -- not on this chart; they're on this chart.

GEN. BLACKBURN:  Do you need a pointer?

(The witness handed a pointer.)

THE WITNESS:  The gunshot wound to the inside of the left eyebrow is here (indicating on diagram) and the small contusion is there (indicating on diagram).

Case 3:22-cv-00280   Document 11-1   Filed 04/19/22   Page 65 of 125 PageID #: 230

1    The gunshot wound at the end of the
2    shoulder went in here at an angle, is diagrammed here
3    (indicating on diagram), and exited in the back here
4    (indicating on diagram), making a small, irregular
5    slit.  That's through the right shoulder.  It did not
6    go across the midline.  The gunshot wound that went
7    into the right chest, from front to back, basically,
8    and it had no corresponding exit wounds.
9            The sizes of the wounds are similar but
10   not exact.  The minimal size, which is fairly
11   important, is .28 inches of Gunshot Wound B to the
12   chest.
13   Q            (By Gen. Blackburn)  And why is that
14   significant?
15   A            Generally, a high speed projectile, like
16   a bullet, will make a hole similar in size to the
17   diameter of the bullet, unless it's going at an
18   unusual angle.
19   Q            Okay.  And what does this one tell you
20   about this particular kind of bullet?
21   A            This -- this dimension here being a .28
22   inches tells me that it's a fairly small bullet.
23   Q            And did you recover the bullet from
24   Gunshot Wound B?
25

                                                    2570

A          Yes, I did.  I also recovered one from Gunshot Wound A.  After the gunshot wounds, I described the puncture type wounds just below the base of the throat here, which was designated Gunshot Wound HB -- or Stab Wound HH, which has a central hole or a little bit eccentric hole and then kind of a tadpole type tail going across.  So it's made by a small puncture type instrument.

The wounds to the neck are diagrammed here (indicating on diagram).  They were in more detail and an abrasion which I didn't designate differently, a small superficial laceration, which I designated II, and then Laceration EE and SS, being a large laceration.  This one is .9 centimeter or .9 inches by 3.7 inches.  This one is .85 inches, as the head is turned slightly away, with length unaffected by that motion of 4.1 inches and shows the regular edges suggesting that there are multiple strokes involved, as it does here (indicating on diagram).

Q          Okay.  Now, the irregular edged multiple strokes of the cutting instrument?

A          That's correct.

Q          And this would have to be a sharp instrument, such as a knife?

A          This would have to be something with a decent edge to it.

2571

Q          Can you tell whether or not it would have a serrated edge or is it smooth or can you tell--

A          I could not demonstrate any serrations to it. Sometimes there can be serrations shown, not always. I did not see any serrations in this. They're usually found at the point type edges of the wound. I did not find any abnormality to suggest that in any of his wounds.

The stab wounds to the abdomen just above and on either side of the belly button are indicated on this chart as well.

And BB, which is to the right side, and CC, which is to the left side, I've measured across the midline here (indicating on diagram). Their dimensions, they are open slightly. They do tend to have kind of a flat edge on each at opposite sides. This can occur with a knife that has a single edge. It is not specific for that, because the side could be duller on this side than on the other side. But the length on this one is a .72 inches. The length on this one is a .70 inches, which should, within a reasonable tolerance, given that the skin is somewhat elastic, be close to the measurement of the width of the blade that inflicted.

2572

Q          Okay.  And again, did you notice any serrations on this?

A          No, no serrations.

Q          Okay.

A          The stab wound to the back, the small of the back, is here (indicating on diagram).  That one I designated JJ, and it is oriented across and again, shows its blunter end here and the edge here (indicating on diagram).  These also have a bit of a tail.  Those kind of curve with an inward motion that's slightly at a different angle from the outward motion, that actually slices the edge of the wound in two pieces.

Q          Okay.  So you can tell it goes in one place and comes out another?

A          Well, slightly different.  It makes a second small laceration as it comes out here (indicating on diagram), because this is a wound that goes basically inward on the body.

Stab Wound AA is back over here just at the edge of the left nipple (indicating on diagram) and has a small abrasion down from it.

Stab Wound AA is further over on the left side of the body, shows maximum dimensions of 1.38 by 0.85 inches this direction (indicating on diagram), which, again, is similar to our dimension here

2573

(indicating on diagram) and is a bit wider. I think
that this knife actually did a bigger turn on being
pulled out, and may not have been placed directly in
and out, but instead may have moved slightly in the
skin.

Q        Could that be either the object moving
or the -- Chad, himself, moving?

A        Yes, and its location made it a little
more amenable to movement, because there are ribs
underneath there. So you're talking about glancing on
ribs, which are tougher tissues to get through than the
two on the abdomen.

There is Stab Wound DD here is way around on the
right side of the chest here (indicating on diagram).
And it's labelled here (indicating on diagram). And it
also shows a tadpole-type shape. It is vertical in
relationship to the body as opposed to these others,
which are oblique.

There is one other knife-type injury,
and that is Laceration GG. And the reason this is not
a stab wound is because of where it is. It's on the
left thumb here (indicating on diagram), and has sort
of a triangular tear in the skin. By its slice, it has
caused an action such as this (indicating) on the skin,
so that this is a loose flap of skin that's been raised

2574

from where it was introduced. And as it slid across got moved, okay?

This injury is suggestive of a defensive type of wound, because it is at an area where if one grabs for the blade, this would be pulled or pushed through that area of laceration.

Q          So that would indicate that Chad Burnett was either, what, grabbing for the knife and trying to keep it from doing that? Is that what you're terming a defensive wound?

A          Yes, a defensive wound means that he had his thumb in the way of the sharp edge of the blade, either trying to push, grab or some other motion. And so this -- this wound was inflicted with the edge of the blade.

Q          How many different types of weapons can -- just from looking at the wounds, can you say inflicted the injuries to Chad Burnett?

A          There would have to be a minimum of three, the gun, which could be similar caliber in all three wounds, a knife that had an edge to it, to cause all of these and this as well, and then something elongated and sharp without an edge to cause that.

Q          Okay. So three different types of weapons?

A          Yes.

2575

1  Q            If you would, with regard to Gunshot

2  Wound A, when you were doing the autopsy, what sort of

3  organs did that gunshot wound penetrate?

4  A            Gunshot Wound A is -- went through the

5  edge of the orbit at that point, broke the bone ahead

6  of it, went through the frontal -- what we call the

7  front part of the skull, the skull, and the temporal

8  skull, which is around the temporal lobe.  It went from

9  front to back and really didn't go up or down as far as

10  his head was concerned.  It may have gone up or down as

11  far as a floor was concerned, if the head had been

12  tilted.  And it really did not go to the right or the

13  left, but, again, that may have been in relationship to

14  his body, because the head may have been turned

15  somewhat.  I don't know.  But at that wound, it caused

16  injury by the bullet going through the area and by bone

17  fragments being shoved away from the area by the broken

18  bone from the impact of the bullet that cause injuries

19  to the left bottom of the brain, the thinking part of

20  the brain, the middle of the right frontal lobe, in

21  other words, the whole left side of the thinking

22  portion of the brain or cerebrum, the inside of the

23  right lobe, and also caused bone fragment disruption of

24  the left internal carotid artery as it was coming up

25  through the skull.  The left internal carotid artery in

2576

Chad above and below the area of laceration and disruption was a fairly good sized vessel. And he would not have lived long after this artery was destroyed.

The bone fragments also went into the temporal lobe of the brain. The bullet itself and bone fragments damaged the olfactory, which is the smelling portion of the brain, left frontal lobe as well. And as a consequence of these injuries to the brain and its blood vessels, with hemorrhage, etc., the lungs started to develop the edema, became filled up with fluid, which occurs with penetrating injuries to the brain.

Q       So, as a result of that, I mean this one was a fatal wound?

A       This wound was a fatal wound. You could not even have a heart survive this from -- for very long. The internal carotid artery is a major vessel that is necessary, his thought processes, his control of his bodily functions would have been ended with the penetration of that -- of that artery.

Q       The -- that's Gunshot Wound A?

A       That's Gunshot Wound A.

Q       What about Gunshot Wound B?

A       Gunshot Wound B is the one to the right chest. Again, it's the contact gunshot wound.

2577

1   Q            Again, the barrel of the gun and muzzle
2   being next to the skin?
3   A            Correct.  It went through the right
4   second rib and right intercostal space, second
5   intercostal, went through the right lung, went through
6   the back of the chest wall between the fifth and sixth
7   ribs and then became lodged beneath the skin, in the
8   back, 57 inches above the heel.
9            Gunshot Wound D is 56 inches above the
10  heel, so you can see it rose one inch in his body.  It
11  was also very slightly, from right to left, meaning
12  that it went at some point at an angle, such as that
13  (indicating).  But basically it went from front to
14  back.
15           Because of this wound, he not only bled
16  into the right side of the chest, approximately two
17  units worth, he also had the disruption of the lung and
18  the bleeding from that and with continuing to breathe,
19  so I do know that he was alive at this point.  He
20  developed air around the lungs and into the skin, which
21  requires the pressure of continue to breathe or be
22  resuscitated.  There -- the area around the gunshot
23  wound then felt like air-filled type fluid in the skin.
24           That's about it for Gunshot Wound B.
25

2578

Q          Could Gunshot Wound B, was that also a fatal gunshot wound?

A          Gunshot Wound B, if given long enough, could have killed him by itself. He at -- you know, initially, might have survived it had he had prompt medical care at a trauma center, first class trauma center with transfusions, chest tubes, etc., but he did live for a while with that wound, which was bleeding in the chest and causing air build up in the chest, was actually shoving the heart to the left and trying to fill up the left side of the space with everything being moved to the left, because the lung is deflating and air is being lost into the chest and out into the chest wall.

Q          Gunshot Wound C, did it strike -- it's an in-out motion?

A          Gunshot Wound C, in an old western terminology, would be considered a flesh wound. It did bleed into the tissues. It was there while he was alive. It was placed there while he was alive, but it went in the front, came out the back and did not strike a vital structure in passage. Okay? It did get muscle, it did get skin, and it did get fat, but no great big muscles and nothing major.

Q          And a person could survive a Gunshot Wound C?

2579

A                    It would take major medical problems

to--

THE COURT:  Hold on just a minute.

THE WITNESS:  -- to die of Gunshot Wound

C.

THE COURT:  Excuse me a minute.  I think

one of the jurors needs to be excused just a moment, to

be excused a moment.  So why we just let whoever that

juror is be excused, and we'll just wait here.  I don't

want to embarrass whoever it is, go right ahead, Ms.

Montgomery.  And you can go in my office.  Mr.

Himmelberg will show you, and then we'll be back

whenever you get here.


                    (Juror No. 2 is excused and

                     then returns.)


                    THE COURT:  Okay.  Go ahead.

Q                    (By Gen. Blackburn)  Okay.  Dr. Harlan,

the --

A                    Gunshot Wound C, the only way he would

have died of Gunshot Wound C is if he had had long-

term complications like an infection that wasn't

controlled.  So it would have taken almost no

medical care for him to have died.

                                                2580

Q          And the damage done by the stab wound,
if you would, just describe each of the stab wounds.

A          If we go in order on that chart, Stab
Wound AA, labelled that simply because I'd already used
A, B, C and D for the gunshot wounds.  So we went for
double letters.

          AA is just on the outside, anterior to
left nipple.  It's 5.35 inches to the left side of the
midline.  What it did was to go to maximal depth of 2.8
inches.  And I measured this through the tissue and
into the left lung, which it did go into.  And it went
basically from front to back and left to right, meaning
on him, approximately that angle (indicating).  And
it's oriented vertically, vertically (indicating).

Q          When you say a depth of 2.8 inches, what
does that tell you about the knife?

A          The maximal depth of 2.8 inches tells me
that it requires a blade about 2 and a half inches long
to make it.  If I have a blade with a hilt on it at 2
and a half inches, I can actually indent the skin
slightly if it's sharp enough and push it in slightly
further than that.  So it would have required a minimum
blade of around two and a half inches.

Q          So a minimum blade?

A          Correct.

2581

Stab Wound BB here is here on him
(indicating on diagram).  This went into the abdomen,
went through the skin into the peritoneum, which is the
cavity around the gut, etc., and went into the right
anterior liver.  Its maximal depth was 2.35 inches, so
it's slightly less deep than the first stab wound that
I showed you.  It's going from front to back and
slightly from inferior to superior, which is angled
upwards.

The third stab wound is here (indicating
on diagram) and is also obliquely oriented; in other
words, it goes across like this (indicating on
diagram).  And it's going through the abdominal wall;
it went through the front edge of the stomach.  It did
not go out the back side of the stomach.  And I don't
know how full his stomach was or how deep in the
stomach it went, but it did go into his stomach.  So
its miminal depth is 1.8 inches.  I can track it that
far in, but because it's going into a stomach bubble
and whatever else, I can't tell you how deep it went
after that hollow edge of the stomach there.  It was
going from front to back, inferior to superior, and
from left to right.  So it's all three things at the
same time.  That's that one.

2582

Stab Wound DD is to the right lateral
chest. That's the point up here, almost in the armpit
here. And that's got a maximal depth of 1.8 inches and
went from right to left, slightly from up to down, and
went from posterior to anterior. It came in from the
side like. At the point where this went into the chest
wall, it did not strike lung, and it's at an odd angle.
So I don't know if it didn't strike lung because the
lung was already being shoved over by the fact that it
had a gunshot wound and was, therefore, deflated, or if
it just missed the lung.

Stab Wound EE at the top of the two
bigger lacerations or slice wounds to the neck. And it
is not abundantly deep. It's 64 inches above the heel.
It's mostly to the midline and left and did cause
bleeding, but it did not get major life structures. It
did get small vessels, so it did bleed. So I know that
it was put there while he was alive.

This wound is the next big wound. It's
beneath the one I just described. It also had acute
hemorrhage to it.

Q       When you're saying "acute hemorrhage",
that would be --

A       Bleeding. So I do know that he was
alive on that one. He also was alive when the wound to
the left thumb was made. That also bled.

2583

He -- the next wound was also a stab
wound, but it's a very small little hole. And that one
went only .3 inches deep, so we're dealing with a very
shallow wound, but then it's placed directly over the
sternum. The sternum is a very sturdy bone. It also
bled. It did show vital reaction. Stab Wound II, I
went back and charted this one, because it was a little
deeper than at first I had noted, but it's still
superficial, and it's between the other two major slice
wounds to the neck.

Stab Wound JJ is through skin and
skeletal muscle. That's diagrammed here and it's on
the back side here and it went to a depth of 2.9 inches
through skin, muscle, and in between the vertebral
processes. It's directed from front -- excuse me --
from back to front, slightly from his left to his right
and slightly from top to bottom. So it's approximately
at that angle (indicating). And that one also did
bleed. That was while he was alive.

Q        Dr. Harlan, while you're down in front
of the jury, I'm going to hand you a series of
photographs and ask you to see if you can look at those
photographs and identify them?

A        Yes, I can. These are all of Chad
Burnett.

                                                    2584

Q                   If you would, take those

photographs--

                    MR. NEWMAN:  Your Honor, excuse me.

For purpose of the record, now that Your Honor has had

a chance to see the chart, we renew our objections

concerning the photographs.

                    THE COURT:  Okay.  The Court will

overrule your objection.  Go ahead.

Q                   (By Gen. Blackburn)  Dr. Harlan, if you

would, take those photographs and turn around and

explain to the Ladies and Gentlemen of the Jury what

each one represents and what does that tell you about

those injuries.

A                   This is a photograph of Chad's face

(holding up photograph), which shows me several things,

the contact gunshot wound to the eyebrow is here

(indicating).  There is bruising beneath it.  It did

not take this long to kill him or this would have been

a much bigger bruise.  There is some hemorrhage in the

neck involving these, not a marked amount.  I might

have expected more bleeding had they been early in his

dying episode rather than late.  So I think these are

probably late injuries.

Q                   What about the gunshot wound, can you

tell whether the gunshot wound came before, during or

after death?

                                              2585

1  A          The gunshot wound came before death.

2  Q          Okay. And that is by -- what is it

3  that--

4  A          The bruise to the left eyelid here

5  (indicating on photograph).

6          The next photograph (holding up

7  photograph) is of Chad's neck and it shows several

8  things. These are the abrasions which are not very

9  deep. That's an abrasion and lacerations or slice type

10  wounds to the neck. And this photograph has been taken

11  with the head to show the wounds the best. In other

12  words, instead of the front or side, this has been

13  taken obliquely from wounds that are directly across

14  the neck here (indicating on photograph). Also, the

15  head has been turned to the right to allow me to show

16  their maximal depth, etc.

17  Q          And can you tell from that whether or

18  not those wounds were before, during or after death?

19  A          These are -- these do show some vital

20  reaction but not a marked amount. There is some

21  bleeding here, and it did slice blood vessels in the

22  neck, but not the major bleeding I'd expect if he were

23  a healthy individual at this point.

24  Q          And how many different lacerations or

25  how many different cuts can you actually see in that

2586

photograph?

A    I can see a minimum of four, but this one shows several edges on it. And instead of at -- well, with a knife that's being put into a tissue, you can put it in and pull it out and have two different edges on the sharper edge of the knife. In a wound like this, pulling it across one time does not make two tails on the wound. Instead, that's -- that's two separate wounds. These did not line up in the skin folds as one wound.

Q    Okay. So that would mean that the knife is going across the skin how many times?

A    A minimum of two with this one, a minimum of two at this one, one with that one, and one with that one. So there were probably actually six times across the neck.

Q    Six times across the neck. And that's what's demonstrated by this picture?

A    Yes.

Q    And this is while he is dying?

A    This is while he is dying.

This photograph is of Chad's left thumb. (Holding up photograph). And it shows how the injury was inflicted by the -- by the drawing of the knife across the finger there.

Q    Okay. This is a defensive wound --

2587

A        That's the defensive wound.

This injury I did not yet talk about. (Holding up photograph). This is an injury to the upper left thigh. And again, this one did not cause major injury. And I'd call it a superficial laceration. I did not designate it with AA, BB, etc. Basically, I was very tired of writing by that time. And I'd come to the bottom of that page. So I, instead, designated this as a superficial laceration, meaning that it did no major damage and charted it as being 29 and a half inches above the heel. That also shows vital reaction and is transversely oriented. So his leg would be like this (indicating), with the number upside down.

Q        When you say "vital reaction," meaning it was --

A        It was while he was alive. This may or may not be a defensive wound. If he's trying to get something in the way of a sharp object, that could have occurred during the struggle. I don't know.

This is the wound to the back. (Holding up photograph). If you're looking at it from his back, it would be this way (indicating). And that is a stab inward type wound to the small of the back. Again, it shows vital reaction. It does show bleeding, etc.

2588

There is a little reddening around the skin, around the edges.

These are the two stab wounds to the belly button area. (Holding up photograph). If I put it like this, and you realize that I am taking a photograph from his right, here is his belly button, here is the taller or the higher of the stab wounds, which is BB, here and here is CC, here (indicating on diagram). We just use this thing here to show us relative size. This is a centimeter ruler. And these again are basically directed towards the inside of the body. And they show the reddening of the edges of the wounds as well.

Q        Again, that -- he's alive?

A        He was alive.

This is a photograph (holding up photograph) of his chest. And I've taken it from the left side, basically, to show stab wounds just to the outside of his nipple, but it also shows a little abrasion here that I did not separately chart as a stab wound. It's just an abrasion. I don't know how it occurred, but it's about the same age as all the other injuries, but it didn't do any major damage. He also has an abrasion here (indicating on photograph). I think he had those -- no, he does have punctate abrasions here, and I believe that's all.

2589

1   He does have abrasions here, here, and
2   here (indicating) on the right shoulder area.  I'll
3   show you those in a minute.  This one does show, it's
4   from the right side, if he's lying down, which is how I
5   viewed him, it would be like, this is little abrasion
6   here (indicating).  This is the puncture wound, it's a
7   closer puncture wound shot than the one I'm going to
8   show you in a minute, show a little tail off it, the
9   fact that it is a very round little hole rather than
10  being a slit-like hole here (indicating).  This is a
11  relatively close-up shot of the Gunshot Wound B, but
12  I've taken it from across the body, it's over here on
13  the right side of the chest.  And it shows a relatively
14  dense black color around the wound indicating the
15  deposition of powder because it's a contact nature.
16  Q           All right.  So this would show three
17  different types of weapons.
18  A           Three different types of weapons --
19  Q           And --
20  A           -- in one photograph.
21  Q           -- all of which were the injuries
22  inflicted prior to death?
23  A           Prior to death.
24  Q           All right.  This is the last photograph.
25  This, again, if you imagine Chad -- it's difficult to

                                                    2590

do it that way. Let's do it this way. These are some abrasions, but the important things are the gunshot wounds to the right chest. That's B.

Q        The contact wound?

A        The puncture wound. Yes. That would be. The puncture wound here (indicating) with a little tail on it, some scrapes there. And this is the wound that went through muscle type tissue, in and out. And here is the stab wound to the right side of the chest (indicating).

Q        So, again, that shows three different types of weapons, the number of weapons, and also before death?

A        Before death.

Q        All before death?

A        (No response.)

Q        What, Dr. Harlan, was the cause of death of Chad Burnett?

A        Because several of his stab wounds, if given long enough, could have resulted in his death, I listed his cause of death as being multiple gunshot wounds and stab wounds. Several of the stab wounds were deep enough that if given long enough they could have led to his death. The gunshot wounds to the right chest certainly could have caused his death. He was probably in a weakened state by the time he received

2591

1    the final gunshot wound, which was the gunshot wound to

2    the edge of the left eyebrow, which killed him rather

3    quickly.

4    Q            So that he -- all of his injuries

5    occurred before death?

6    A            All of his injuries occurred before

7    death.

8    Q            Can you tell anything about from your

9    viewing of the body the time of death of Chad

10   Burnett?

11   A            Chad, when initially viewed, by and

12   others was in rigor mortis, had fixed posterior livor

13   mortis, and had begun to show drying around the edges

14   of the wounds, etc.  So he had been dead for more than

15   12 hours.  If I tried to go back and -- and categorize

16   that further on him, I would say that it was probably

17   right around 12 hours at that time.

18   Q            From when he was first viewed or longer?

19   A            Uh --

20   Q            Would it be consistent --

21   A            From when I started the autopsy.

22   Q            When the --

23   A            No, excuse me, from when first viewed.

24   Q            When -- would it be consistent with

25   being dead around 11:30 on October the 1st?

                                              2592

A          Yes, it would.

Q          So that's his time of death.  During the course of your autopsy, do you also look at the stomach contents?

A          Yes, I do.

Q          And what were you able to determine about the stomach contents of Chad Burnett?

A          We actually weigh and measure our stomach contents.  And what we found was that he had in his stomach 180 cc.'s dark green-black mush which you couldn't see through.  And it contained bits of onion, cheese, green pepper, black olives, mushrooms and pepperoni.

Q          Would that be some of the ingredients of a pizza?

A          That sounds like a pizza supreme.

Q          And based on what you could see, can you tell anything about the time of death with regard to looking at the stomach contents?

A          I can tell that Chad ate within one hour of the time that he died.

Q          I think that's all I had with regard to Chad.

GEN. BLACKBURN:  Your Honor, at this point I'm going to request that the photographs be made an exhibit to our hearing and that the two charts be a

2593

1   collective exhibit as to Chad Burnett.

2           THE COURT: Okay. The pictures will be

3   one collective exhibit and the diagrams will be another

4   collective exhibit as the next number as to Chad

5   Burnett.

6

7           (State's Exhibit No. 33,

8           photographs, marked and

9           filed.)

10

11          (State's Exhibit No. 34, two

12          (2) charts, marked and filed.)

13

14   Q        (By Gen. Blackburn) Dr. Harlan, after

15   you did the autopsy with Chad Burnett, did you then do

16   an autopsy of Judith Smith?

17   A        Yes, I did.

18   Q        And what, if you would, in doing this,

19   do you recognize these two charts?

20   A        Yes, I do.

21   Q        And are these the charts that you made

22   with regard to the autopsy of Judith Lynn Smith?

23   A        They are enlargements of those charts.

24   Q        Would you just, either using the charts,

25   or explain your view of the body of Judith Smith.

2594

A          Okay. Let me make one note here. All
of the information, I believe, is on that one. There
is one -- a Special Chart 11 here. And the edges of
the abrasion here got cut off by our xerox machine's
copy.

          All right. The wounds on Judith were a
gunshot wound, which was not contact, which did not
show near stippling, but instead showed that the muzzle
had to have been more than two feet from the left arm,
which entered the back side of the left arm and came
out the front side of the left arm. Those are
designated as Gunshot Wound B and Exit Wound C. This
did show vital reaction. She was alive when this
occurred. It did not lead to her death.

Q          Let me stop you at this point. When
you're saying the back side of the arm, it would have
to be facing the --

A          Anatomic -- anatomic position would
place that at the back side of the arm. That doesn't
mean that she was shot from the back. She could have
easily have been shot through the back side of the arm,
with her arms back side toward the gun, facing the gun.

Q          Okay. So she could have had her -- like
her arm between the gun and the other parts of her
body?

A          That's correct.

                                              2595

Q          Okay.  Gunshot Wound A.

A               Gunshot Wound A is at the top of the
neck.  It does not show well on any of these diagrams
because this is a front and back shot.  And this is a
side area, but it's approximately here (indicating on
self).

                Gunshot Wound A, when -- especially when
compared to Gunshot Wound which is .24 by .24 inches is
somewhat bigger and shows a large amount of black color
around it, which is the powder burn.  This is a gunshot
would which would be described as being a near gunshot
wound, but I can qualify that a little bit further by
telling you that anything within two feet is considered
a near gunshot wound, because it will leave a spray of
black powder.  This is considerably closer than that.
And while not immediately adjacent to the skin, has to
be very close to it, because this did not have the
stipple pattern around it that a further back gunshot
wound would show.

Q               So on Chad we had contact wounds, we've
got the near gunshot wound and then the other --

A               What we would classify as a distant
gunshot wound being more than two feet from the skin to
the muzzle.

Q               This one was within two feet or closer?

                                        2596

A        Definitely.

All right. Those were the gunshot
wounds. She also had a slice wound to the neck. Hers
is a bit different because instead of being over here
with the gunshot wound it's more on the right side of
the neck coming around to the midline. And this one on
her does not show even a degree of bleeding that those
on Chad showed. Now, I qualify that by saying "mild
hemorrhage." The amount of bleeding that was present
from this slice was about that that would be drained if
you slice something that's already dead or dying. So
circulation to the neck was not good at this point.
Her heart may have actually already stopped.

Q        So these lacerations to her neck could
have been after death?

A        At or after death.

The Stab Wound BB, again, is superficial
and it's here (indicating on diagram), and it's a
small, narrow wound, very similar to Chad's wound that
was here (indicating on diagram), but it was a little
further down and right here (indicating on diagram).

Stab Wound CC is, again, small and
round, superficial, and right there (indicating on
diagram). Stab Wounds DD and EE are, again, round.
This one (indicating on diagram) is only .08 inches
by .015 inches, but it is at a little bit of an

2597

oblique angle causing that kind of ovoid or a
tadpole-type shaped wound there.

This one, again, is a puncture type
wound.  The injuries that these cause internally were a
little interesting, too.  The near gunshot wound to the
neck went through the skin, through the soft tissues in
the neck, through the C-3 vertebral discs, through the
cerebral -- through the cervical spinal cord, slicing
it into.  And the bullet was recovered in the cervical
spinal canal.  The bullet was at 59 inches above the
heel.  The entry wound is at 60 inches above the heel.
The direction of the bullet went was from left to right
and from anterior to posterior.  So we're talking at an
angle left to right and anterior to posterior, but not
downward or upward.

Q            What would be the effect of this gunshot
wound?

A            This gunshot wound, because of the
injury, which is a transection, a total separation of
the cervical spinal cord would have rendered her
incapable of moving her arms or legs at that point.

Q            In other words, she would have been
paralyzed from the neck down?

A            That would have been instant paralysis.
She also had subdural hemorrhage in the area and

2598

bleeding. She also had subarachnoid hemorrage from it.
I doubt seriously if she would have been capable of
breathing at this point. If she did, it was not for
very long. There was some bleeding into the upper
airway, and it did not really get down far into the
lungs. So I think she may have had a few deep breaths,
and that's about it.

In -- in going through the neck and
being lodged in the canal, it went through the basilar
artery and left vertebral artery or actually lacerated
those arteries from the motion as it went past. That
caused bleeding inside the brain itself, caused a
hematoma of the left internal jugular vein in the neck.
That quickly ended her life.

Q        What -- the -- how many different types
of weapons were used on Judith Smith?

A        I doubt seriously if the puncture wounds
that were superficial here (indicating on diagram) were
made by a really, really sharp instrument capable of
giving the slice that we have here (indicating on
diagram). So I really believe that there are a gun and
two different types of instruments to make the stab and
slice shapes.

Q        So, again, three different types of
weapons?

A        Correct.

2599

1  Q            Can you state anything at all about the
2  -- the instrument that was capable of doing that
3  slicing -- slicing motion?
4  A            Not very much.  Again, I did not see
5  evidence for serration.  And its depth of the slice
6  was .8 of an inch.
7  Q            So no serration and -- but with regard
8  to the depth, it did not go very deep.
9  A            It did not go very deep, but it should
10 have made more bleeding than it did, because .8 of an
11 inch is approximately that far (indicating with hands)
12 beneath the skin.  And in the area that it went in,
13 there are plenty of smaller blood vessels that should
14 have been redder had the heart still been functioning.
15 Q            And the puncture wounds were caused by
16 what kind of an instrument?
17 A            Again, it's something with a sharp
18 point, like an ice pick, something similar to that.
19 Q            Similar to ones that you observed on
20 Chad's body?
21 A            Yes.
22 Q            Was there any way to tell from your
23 observations whether or not the same instrument was
24 used on both Chad and Judith?
25

                                              2600

A          Not precisely, but it appears likely. I can find no dissimilarities.

Q          The puncture wounds, were they made before or after the death of Judith Smith?

A          The puncture wounds charted here (indicating on diagram), there was very, very little bleeding. And particularly, on the one here, which I diagrammed here (indicating on diagram). Stab Wound -- let's see, it's not BB. It's EE, here (indicating on diagram). That wound went in a maximal depth of 2.20 inches. And it was going from front to back and a little bit from bottom to top. And it went into the right lobe of the liver, and yet, it caused no major bleeding. A liver, when stuck, bleeds, remarkably. This was capable of producing with these sized holes, but at the same time it didn't bleed, so I believe that Judith's heart had already stopped by the time that this wound was administered.

Q          Okay. So the puncture wounds are after death?

A          I do believe they are.

Q          Dr. Harlan, let me hand you a series of five photographs and ask you if you'd look at those and see if you can recognize those.

A          Yes, I do. I took these, and they are all of Judith Smith. The first one is a photograph

2601

showing the Gunshot Wound A, which is back here, in the
side of the neck just past the angle of the mandible.
And you can see the black coloration around it. You
can also see some red around it. That is vital
reaction.

Q        Okay. Vital reaction, meaning she was
alive when this -- the gunshot wound --

A        Yes.

         The second photograph is of the right
side of her neck, taken from the right. (Holding up
photograph). This is her chin (indicating on
photograph). That's her left shoulder. She's in that
position, and it's obliquely orientated, and it is a
slice type wound. And there's very little bleeding.

Q        Which would lead you to believe this is
after death?

A        Yes.

Q        And --

A        At or after.

Q        At or after death. Can you tell whether
or not there's one or two?

A        On that particular one, I could not see
a good tail type edge at either end. That may have
been one. If it was not one, then the deeper cut had
to have been centrally placed and not involving the

                                        2602

skin.

Q          So one, maybe more?

A          One, maybe more.

This photograph is of Judith's left elbow. (Holding up photograph). This shows the distant of entry gunshot wound to the back side of her arm and a little bruise above it.

This photograph I made before I took her shirt off. This is her left arm coming down this way (indicating on photograph), almost off the photograph. This is Stab Wound BB. And you can see a very small hole in the shirt. It shows that the shirt was also penetrated by whatever caused the puncture wounds. And that's all the bleeding that there was at a time between injury and when she was finally brought in to us.

Q          Which would indicate, again, that it was--

A          There is no indication there that her heart was beating.

Q          So that --

A          So that's about what would be soaked out by a blotter-type effect from the shirt from a puncture on someone that's dead.

This (holding up photograph) is the same wound as it looked after we took the shirt off. And

2603

1  there's -- I mean it's very easy to overlook it. It's
2  a small, little hole there and no reddening around the
3  edge.
4  Q          And what was the cause of death of
5  Judith Smith?
6  A          I listed Judith's cause of death as
7  multiple gunshot wounds and stab wounds. Basically,
8  the gunshot wound that -- that ended her life was the
9  one to the angle of the jaw, upper neck here
10 (indicating on diagram).
11 Q          So the main cause of death would be this
12 gunshot wound (indicating on diagram).
13 A      -   That's correct.
14 Q          Which caused the paralysis. And would
15 the time of her death be consistent with 11:20 or
16 before on October the 1st of 1989?
17 A          Yes, it would.
18 Q          And again, did you look at the contents
19 of -- of her stomach?
20 A          Yes, I did. Hers was somewhat different
21 from that of Chad. Her stomach contained 570 cc.'s or
22 grams of orange-tan mush with green leafy vegetables,
23 sliced peaches, noodles, yellow cheese, orange grease,
24 bread, brown -- brown meat that was ground up, onion,
25 and tomato.

2604

Q            And what would that tell you about the time of death with regard to when she had eaten?

A            She had definitely eaten within the hour of her death. ✳

GEN. BLACKBURN: Your Honor, at this point, I'd request that these photographs be made the next exhibit and the two charts, be a collective exhibit.

THE COURT: Again, the same way, be collective, the pictures, and then the charts another exhibit.

(State's Exhibit No. 35, five (5) photographs, marked and filed.)

(State's Exhibit No. 36, two (2) charts, marked and filed.)

Q            (By Gen. Blackburn) Dr. Harlan, after you performed the autopsy on Chad and Judith Smith, Chad Burnett, did you then perform an autopsy on Jason Burnett?

A            Yes, I did.

Q            Okay. If you would, just describe his injuries.

2605

1   A        If you'll look, we do have a chart
2 that's different from the other two. Basically, these
3 are the same two types of charts for him. Jason had no
4 gunshot wounds. Instead, he has all stab type wounds
5 and lacerating type stab wounds.

6        He had a few abrasions on the back of
7 the neck, some scars and other things, a yellow and
8 purple contusion of the left eye, which is something
9 that occurred prior to the episode leading to his
10 death. This would have required a day or more to have
11 shown that yellow-purple change. The contusion here
12 with the central abrasion, however, was -- the other
13 abrasion that's listed on here are also fresh.

14        What he had was a series of stab wounds.
15 Let me begin with A, which is the one to the left side
16 of his neck. And again, this stab wound is looked at
17 uneven and shows some change around it that just
18 suggests more than one motion back and forth. This one
19 is from the left, clear across the midline slightly on
20 the right, but more on the left than the right.

21        That one was directed inwards. It had a
22 maximal depth of half an inch and showed dimension of
23 6.2 inches by .65 inches. So it's over 6 inches long.
24 This one did bleed. He was still alive and still --
25 heart activity was going on when this occurred.

2606

Stab Wound B is to the upper abdomen. This is its shape, .8 by .4 inches, and places it in the same range as the stab wounds that we've described on his brother. Stab Wound B is here (indicating on diagram). This stab wound went through the abdomen, went through the entire anterior abdomenal wall, went through the entire thickness of the left lobe of the liver, went through the inferior vena cava, which is the big vein that takes blood all the way from the -- everything below the diaphragm back into the heart and also got the right edge of the first lumbar vertebrae disc. We're talking backbone disc, and then ended in the right perispinous muscles and deep fat beneath the skin in the back. Its minimal depth is 5.1 inches.

Q    So what does that tell you about the injuries that cause that?

A    The blade almost had to have exceeded more than about 4.8 inches in order to have indented the skin that far and would depend somewhat on how much he was able to give, how much force was used and how sharp the instrument was as to what its actual length would have been.

Q    And it has to be at least 4.8 inches long?

A    Correct. This was directed from the front to the back but from the inferior to superior,

2607

meaning it was angled upwards. And it was angled from left to right. And it actually went across the midline and into the back there (indicating on diagram). And there was quite a bit of bleeding from it. He had two shared wounds that could have caused all of the bleeding that we saw.

And the next one is the one that could also have been a fatal wound. That would could have been fatal, and it would have taken him a matter of minutes to die. The other wound, also, could have been fatal and, again, would have taken a matter of minutes, possibly half an hour to die.

Stab Wound C is a very long stab wound, but even though it looks like a slice-type wound, it has to have been done with major amount of depth to it. So I believe it was from a raking motion, not of a slice but instead of a knife put in and pulled.

Q      And why is it that you think that?

A      I think this because of its depth.

Q      And what's that?

A      Its minimal depth is 3.8 inches.

Q      Minimal depth?

A      Minimal depth.

Q      And maximum depth?

A      About that.

2608

Q        What was actually --

A        You can actually trace it that far.

Q        What was the result of that particular raking motion?

A        The result there is that it went into the abdomen, raked across and lacerated the left common iliac vein, which is the big vein coming up from the leg.  It carries everything from the leg and part of the pelvis up into the inferior vena cava and also got the muscle that's attached to the backbone and had quite a bit of depth within that muscle.  And the result of it not only was the bleeding that occurred, but the majority of the small bowel was exposed to that wound and made its way out of that wound.

Q        That was as a result of the raking motion?

A        No, it's a result of the big wound.

Q        So it cut the muscle to the extent that the lower bowel came out?

A        The upper bowel.

Q        The upper bowel.

A        The small bowel came out, yes.

        The other wounds that he had were to the trunk.  They're not as impressive.  He had a Stab Wound D, here, (indicating on diagram), to the lower abdomen. And its minimal depth because it was between loops of

2609

1  bowel, and we couldn't trace exactly how deep it went,
2  but was 1.2 inches.  It did go into the peritoneum
3  cavity and did bleed in the issue around it.
4            Stab Wound E was to the right anterior
5  chest, here, (indicating on diagram), and its maximal
6  depth was 1.2 inches.  Stab Wound E, again, is .44
7  by .25 inches.  This is not a puncture.  This on him
8  was some drying of the wounds prior to the fact of me
9  charting it, giving it a more ovoid appearance.
10 Q            When you say "not a puncture", how many
11 types of instruments were used on Jason Burnett?
12 A            Jason may have had all of his injuries
13 from one instrument.  They were certainly all in the
14 classification that we would consider that of a knife.
15 Q            Can you tell us anything about the
16 knife?
17 A            It would had to have been fairly sharp.
18 It would had to have been fairly long.  It could have
19 been something such as a barber's type razor.  It could
20 have also been a sharpened cutting knife or a kitchen
21 knife that was very sharp.
22 Q            A cutlery type knife?
23 A            If it were sufficiently sharp.
24 Q            Was there any evidence from your
25 observations of the wounds a serrated blade?

2610

A        No, there was no observations to suggest serration. There is an unusual pattern to Stab Wound D. And there is a little bit of a V-shape to it. And I don't know whether this represents a second small slice here and a bigger slice here and an instrument that may have had a single edge for most of its blade or not. But that does suggest that. And there was some suggestion of that sort of thing with his brother's wounds as well.

Q        So from the suggestion of this wound and some on Chad, you're saying that the same knife was used?

A        May well have been. And I really can't tell whether it was a double-edged knife, a single-edged knife with a partial double edge or just an awful lot of activity with a single-edge knife.

Q        When you say "a lot of activity," that is movement?

A        Yeah.

Q        Either --

A        Twisting.

Q        That would be caused by either the movement of the knife or the body on the knife?

A        The movement of the boy or the movement of the knife in relation to the movement.

2611

In addition to those, we have another
chart here to show the injuries to Jason's hands. He
has on the back of his right hand a little laceration
here, but he also has a big laceration to the angle of
the thumb that shows it slightly here (indicating on
diagram). This is the right thumb on these two. This
is the left hand (indicating on diagram). And there is
a slice here that extends around onto the back side of
the hand slightly, and a slice here (indicating on
diagram). But the majority of the injuries are where
he can have gotten them by grabbing at the knife, at
the blade. And these three could have conceivably been
made by one stroke, if he had hold of it with his right
hand, left hand, excuse me, if he had hold of it
pulling, and there was force against those fingertips.

This represents the second one and this
a third one (indicating on diagram), or possibly more
than one. This could have been multiple times through
the thumb area there. I can't really tell.

The right hand -- I'm sorry, I don't
know whether he was right or lefthanded, but the right
hand sustained more injuries to the palm side. And
again, these were slices across the palm to the thumb,
little scrapes on the fingers, and bigger scrapes, and
a large scrape across the base of the knuckles. This

2612

one -- these two did line up. This one didn't line up quite as well, but could conceivably have been from that. I tried to calculate how many times he would have had to have grabbed the knife and had it removed from his hand and grabbed the knife as it was coming toward him in order to do those injuries. And you really can't get a -- a really good number on it. There -- it could range from about 10 to certainly more than 13.

Q        So 10 to 13 times that the knife would have had to have enter the hand --

A        Yes. If there is -- the reason my estimate is a little lower than I think, because there may have been a double-edged blade. And some of these injuries may have occurred because the skin's being folded up around something with two blades, edges.

Q        What -- how do you classify these type of wounds on Jason's hands?

A        These injuries on Jason are quite characteristic of what we see with defensive type wounds. I'm assuming that he did not deliberately try to grab something that sharp unless he needed to. So I do think that these are -- are defensive type wounds. They're not the sort of thing that one does to one's self unless one's trying to protect one's self from a sharp instrument.

2613

1   Q          The injuries to Jason in all of these,
2 were they before or after death?
3   A          They are all before death.
4   Q          And the hands and all. What was the
5 cause of his death?
6   A          I classified his death as being due to
7 multiple stab wounds. To be a little more exact, he
8 died from quite a bit of bleeding. Two wounds, in
9 particular, could have led to his death much more
10 quickly. And those were the two that I showed you,
11 here and Stab Wound B (indicating on diagram),
12 because those did get major blood vessels. They did
13 get veins rather than arteries. And it takes a while
14 longer because they are not under pressure that an
15 artery is, in order to die.
16   Q          All right. I'd hand you a series of six
17 photographs, and ask you to look at those and see if
18 you can identify them.
19   A          Yes, I can.
20   Q          If you would, please explain what each
21 one of them represents to the jury.
22   A          Yes. This is (holding up photograph)
23 Jason's neck injury. This is the extent of the left
24 side of the neck. There's also -- you can see the
25 bruising of the eye that's beginning to fade. The

2614

other important thing in this photograph is this purple color. And the purple color here (indicating on photograph) is not bruising, this big one. The purple color here is because he was lying on his left side for more than 12 hours before he was removed from his left side.

Q      So if he were found on that left side--

A      Yes.

Q      -- or first observed by someone, he would have had to have been on that left side --

A      For more than 12 hours prior to being moved. The reason for that is that livor mortis, which is what this represents is pooling of the blood by gravity. As it pools, it can be, if you roll the person, then it will start pooling in the other direction. It only begins to fix in the tissues at approximately 12 hours. His, I think, had been more than 12 hours because it did not move during the entire time of the autopsy. Some of these photographs were made more than a day later. He had been lying on his back in our facility during that time and still has this anterior left side pooling of the blood.

Q      So that would tell you or would it tell you that he had been laying on that left side prior to being found at least -- or prior to being moved at least if not more than 12 hours?

2615

1    A              Correct.

2                   The second photograph shows that same

3    finding, but it also shows the extent of the wounds,

4    which comes from behind the left ear, clear across the

5    right midline.  It also shows his shirt that he had on

6    with quite a bit of blood soaked into the shirt.

7    Q              And what does that -- what does that

8    wound show you about whether or not that was before

9    death and can you tell --

10   A              That -- that shows me that there is an

11   accentuation of the blood up here around the neck.

12   There is some pooling back here on the back of that.

13   And this shows me that he was alive and did bleed after

14   the injury to his neck.

15   Q              And can you tell how many strokes that

16   that laceration made?

17   A              That laceration has got some unusual

18   directional changes to it.  And the right side of it,

19   in particular, has two little tails over there.  So it

20   suggests at least three changes of direction across.

21   Q              Would that be three different slices

22   that--

23   A              It could be three different slices or it

24   may be going across it while moving.

25

                                            2616

Q        It could be moving across it three times without removing the blade?

A        Yeah.   Either three slices, probably in this direction (indicating) or three times like that (indicating).

Q        But three separate movements?

A        Correct.

Q        On his neck.

A        Correct.

The other photographs that I have are of his hands to show what the diagram also attempts to show, and that is, the injuries mostly to the palm side of his hands.   This is the back of his right hand.   You can see the injury to his right thumb and the small injury to the back of the right thumb (holding up photograph).

This one is of the palm side of the left hand.   The thumb is over here off the photograph (holding up photograph).   But it shows the slice marks to the fingertips.

The next one (holding up photograph) is the palm side of the right hand and shows the numerous different slice marks across, basically, the right hand.   There's a little variation in angle.   Some of these are a little deeper.   And some of them may have been like this (indicating), others trying to grab

2617

1 something aimed at or being pulled away from him.

2 Q          Is this the hand that has a minimum of

3 ten to thirteen different --

4 A          Right.  And as I said, there could be

5 more than thirteen.  I really can't tell, for instance,

6 how many times it may have gone through that same

7 slice.

8          The back of the left hand is shown in

9 that photograph (holding up photograph).  To show that

10 two-tailed laceration there and the ones here

11 (indicating).

12 Q          And what does the two-tailed

13 lacerations tell you?

14 A          That tells me two different changes in

15 direction, being pulled through them twice, two

16 strokes.

17          GEN. BLACKBURN:  Your Honor, again, I

18 would request that those pictures be made a collective

19 exhibit and the charts be a collective exhibit.

20          THE COURT:  Okay.

21

22          (State's Collective Exhibit

23          No. 37, six (6) photographs,

24          marked and filed.)

25

2618

```
                    (State's Collective Exhibit
 1                  No. 38, three (3) charts,
 2                  marked and filed.)

 3

 4      Q           (By Gen. Blackburn)  Take your seat,
 5      Doctor.

 6      A           All right.

 7

 8                  (WHEREUPON, the witness returns
 9                  to the witness stand.)

10

11      Q           (By Gen. Blackburn)  Dr. Harlan, can you
12      tell how long it had been since Jason Burnett had eaten
13      at the time of his death?

14      A           Yes, I can, within limits.  Within his
15      stomach, he, as his brother, had a -- a fairly full
16      stomach.  He had 430 cc.'s of tan, thick mush with
17      yellow grease, sliced black olives, onions, mushrooms,
18      a small piece of paper that I'm still wondering about,
19      flat noodles, tomato and green pepper.

20      Q           Would that also be ingredients of a
21      pizza?

22      A           Part of them could well be the
23      ingredients of a pizza.  I really don't know where he
24      got the flat noodles and I don't know if he just was
25      very hungry or how he got the piece of paper.
```

                                                2619

1    GEN. BLACKBURN:  If I can have just a
2  minute.

3
4                     (Pause in the proceedings while
5                     Gen. Blackburn confers with
6                     Gen. Thurman.)

7
8    Q           (By Gen. Blackburn)  Dr. Harlan, did you
9  have an occasion to, one, go to the -- 324 Lutie
10 Street?
11   A           Yes, I did.
12   Q           And in addition to that, did you also
13 look at some knives that were collected from 324 Lutie
14 Street?
15   A           Yes, I did.
16   Q           And when you looked at those knives,
17 were there any of those that could have been used to
18 cause any of the injuries that you saw?
19   A           The knives themselves did not appear to
20 be very sharp.  Several of them didn't have handles.
21 And it would have taken quite a bit of force to inflict
22 the majority of the injuries that I saw here.  The one
23 thing that I have not seen is the implement that --
24 well, I haven't seen the implement that produced the
25 puncture injuries either, if one was collected.

                                            2620

Q          Okay.  Well, Dr. Harlan, I'll hand you
Exhibit No. -- have the court officer hand you
Exhibit No. 8, and ask you if you can look at that.

A          All right.  This could easily be the
instrument.  It would certainly take something about
the size and sharpness of this.  And that could be the
ones that produced the puncture wounds, particularly
the ones to the chest there.

Q          So that awl that's been previously
identified could, in fact, have produced the
puncture wounds that you observed on both Judith Smith
and --

A          Chad.

Q          -- Chad?

A          Yes.

Q          Dr. Harlan, I'll have -- I'll hand you
what's previously been identified as Exhibit 30 for
identification only, and ask you if you would look at
that and see if you can identify that?

A.          Yes, I can.

Q.          And what is that?

A          These are three bullet pouches that I
prepared of the three bullets that I removed from the
victims.

Q          And they were removed from which
victims?

2621

1   A           From Judith and from Chad, two from

2   Chad.

3               GEN. BLACKBURN:  Your Honor, I'd just

4   request that the Exhibit No. 30 be made an exhibit to

5   her testimony.

6               THE COURT:  Let it be done.  Hand those

7   over.

8               THE WITNESS:  All right.

9               THE COURT:  And those will be Exhibit

10  No. 30.

11

12              (State's Exhibit No. 30,

13              bullets, marked and filed.)

14

15  Q           (By Gen. Blackburn)  And Dr. Harlan, I'd

16  hand you Exhibit -- actually, it's a picture from

17  Exhibit 6, and ask you if you would look at that knife

18  and see if that's the type of instrument that could

19  have done the injuries that were to both the -- all the

20  victims?

21  A           It does not appear to have been.

22  Q           Okay.

23  A           No.

24  Q           That's more like a kitchen type knife?

25

Case 3:22-cv-00280   Document 11-1   Filed 04/19/22   Page 118 of 125 PageID #: 283

A            I would -- I would have to take that home and sharpen it first.

GEN. BLACKBURN:  If I can have just a moment, Your Honor.

(Pause in the proceedings while Gen. Blackburn confers with Gen. Thurman.)

GEN. BLACKBURN:  Your Honor, I don't have any further questions of Dr. Harlan.

THE COURT:  Mr. Newman.

MR. NEWMAN:  Your Honor, if I could have just a second, please.

(Pause in the proceedings while Mr. Newman confers with Mr. Dean.)

2623

```
 1            MR. DEAN:  That's all.

 2            THE COURT:  Mr. Thurman.

 3

 4    CROSS-EXAMINATION

 5    BY GEN. THURMAN:

 6

 7    Q            Detective Smith, you and Detective

      Bernard travelled to Springfield together, did you not?

 8    A            That's correct.

 9    Q            And you both participated in the

10    questioning?

11    A            Correct.

12    Q            But from time to time you would leave

13    the room; is that correct?

14    A            Yes, I did.

15    Q            To do certain things.  So you weren't

16    present the entire time?

17    A            No.

18    Q            He was questioned.  Okay.  During the

19    time you were there, when Mr. Smith would discuss his

20    wife, what tense would he use?

21    A            He was using her name "Judy" in past

22    tense.  Everything he said about her was in past tense.

23    Q            When you started questioning him about

24    where he was and what he was doing, did he ask you why?

25    A            No, he didn't.
```

2648

1    Q                Even after he was informed -- well,
2    let's talk about this emotion.  You say there was
3    watering in his eyes?
4    A                Yes, it was.
5    Q                How long did that emotion last?
6    A                Not very long.
7    Q                Okay.  And after that, did he ever ask
8    you how they were killed?
9    A                Not that I recall, no.
10   Q                Did he ever ask you if you'd caught
11   anybody that had killed them?
12   A                No, he didn't.
13   Q                Did he ask you when they were killed?
14   A                No.
15   Q                And what time did he tell you he
16   arrived in Springfield at his residence with the twins
17   on October the 1st, 1989?
18   A                He said he got back at his home at 10
19   o'clock p.m.
20   Q                Okay.  What did he tell you he did once
21   he got back?
22   A                He said he took his twin boys to his
23   mother's trailer or house and packed some clothes, got
24   a drink of water and then left to go to Kentucky at
25   10:30, around 10:30.

                                                    2649

1  of work on that Monday.

2  Q               And did he say why he told her that when

3  he had to go to Kentucky?

4  A               He said he -- he -- he forgot that he

5  was having to go to Kentucky.

6  Q               So he forgot --

7  A               But he had --

8  Q               -- he had to drive to Morehead --

9  A               -- prearranged it --

10  Q               Excuse me.  I didn't mean to interrupt

11  you.

12  A               He said he prearranged with Judy to have

13  them on Monday.  Normally -- than the week -- longer

14  than the weekend, he has them on the weekend, and he

15  made arrangements to have them on Monday because he was

16  going to be off work, that he forgot that he had to go

17  to Morehead, Kentucky, for that job.

18  Q               And did you see his car that night?

19  A               Yes, I did.

20  Q               What kind of a car was he driving?

21  A               It's a four door white Ford, Crown

22  Victoria.  It's an old police car.

23  Q               Okay.  Did you have any discussions

24  about that car with him?

25  A               Yes, I did.

                                                        2651

CROSS-EXAMINATION

BY GEN. THURMAN:

Q        Mr. Smith, I think you go by the name of Frank, is that right?

A        Yes, sir.  In Ohio, that was my nickname.

Q        And people you work with basically know you as Oscar, but the family calls you Frank; is that right?

A        No.  When I started working for what is now MSC, originally, my uniform said Frank on them.

Q        But you switched it to Oscar?

A        The company switched it.

Q        But you go by the name of Frank; is that--

A        I go by Frank or Oscar.

Q        And let's see, your first marriage -- the wife you talked about, Wanda O'Shea; is that right?

A        That is her present name, yes.

Q        In what year did you marry her?

A        1971.

Q        I believe she was 13, is that correct?

A        Possibly.

Q        Possible?

A        (No response.)

2857

Q      Well, how do you get that, if you're the
beneficiary --

A      Because --

Q      -- and you've already filed claims for
$88,000?  How do you not benefit?

A      Because every penny of that money goes
to the children.

Q      That's not by law, that's --

A      That was mutual agreement between Judy
and I, the same as the way her funeral was supposed to
be arranged, and she knew how I was to be put away if
that was me.

Q      But Judy's not around to enforce that
mutual agreement, is it?  So it will be your decision
about what to do with the $88,000, if, in fact, you get
it; isn't that correct?

A      It's not a decision, really, to be made.

Q.      I understand that.  Right now it's not.
The car that you were driving, the one that was
identified here in the photograph, that was the car you
were driving, is that right?

A      I drove it that day, yes.

Q      Describe that car?

A      It's a '87 Ford LTD.  It's an ex-police
patrol car, has a trailer hitch, a piece of molding off
the back left corner of it, dome light out of it, holes

                                                    2871

in each of the door panels where -- where a shield had
been up in there, to divide the front from the back,
and no door hinges on the back.

Q          Would it go 140 miles an hour?

A          It may.

Q          Do you remember talking to the police
and telling them it would go 140 miles an hour and the
only speed you knew was faster and faster and faster?

A          I don't remember that exact
conversation.

Q          What was the conversation about your
driving?

A          He asked me -- the conversation came up
about the car.  He asked me if it was a patrol car.  I
told him, yes, it was a Murfreesboro police car, and it
140 on the speedometer.

Q          Did you comment about your driving or
your speeding?

A          I told him that I had tried it one time.

Q          So you'd driven that car 140 miles an
hour?

A          Not at 140, no.

Q          How fast would it go?

A          Probably 115, 120.

2872